[No. S031641. July 8, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY O. TATE, Defendant and Appellant.

636

**COUNSEL**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Harry Gruber, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Bruce Ortega and Sara Turner, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—A jury found defendant Gregory O. Tate guilty of the first degree murder of Sarah LaChapelle. (Pen. Code, §§ 187, 189.)[1] The jury also found that defendant personally used a dangerous and deadly weapon, a knife (§ 12022), and that robbery-murder and burglary-murder special circumstances were true (§ 190.2, subd. (a)(17)). Defendant was sentenced to death. This appeal is automatic. We will affirm the judgment in its entirety.

## I. FACTS

A. *Guilt trial.*

1. *Prosecution case.*

Around 8:00 p.m. on Monday, April 18, 1988, Tanya DeLaHoussaye paid a brief visit to Sarah LaChapelle in Sarah's home on Hesket Road in Oakland.[2] Sarah's burgundy Oldsmobile Cutlass was parked in her driveway. Sarah was wearing a nightgown and said she planned to lie down because she had a cold.

At 11:00 a.m. on Tuesday, April 19, 1988, Anthony LaChapelle, Sarah's son, went to her home and noticed her Cutlass was not in the driveway. The front door was open, though the outer screen door was closed. Anthony went

---

[1] All further unlabeled statutory references are to the Penal Code.

[2] We sometimes identify the victim, Sarah LaChapelle, as Sarah in order to differentiate her from her son, Anthony LaChapelle, to whom we generally refer as Anthony.

in and found his mother dead on the living room floor, dressed in a nightgown. Her body had been impaled with a butcher knife and a barbecue fork. Her ring finger had been cut off and was lying near her body. A chair had been turned over, items had been tossed about, and the room was in disarray. There was a hole in the back door. Anthony called 911.

An autopsy confirmed that a knife was embedded in the victim's back, and a barbecue fork was stuck in the side of her neck. She had multiple stab wounds on her back, buttocks, and neck, some inflicted by a knife different from the one lodged in her back. There also were incised, or slicing, wounds on her left shoulder, right index finger, and right thumb. Her back and face exhibited numerous puncture wounds, caused by something small and sharp entering the body, including one such wound that had penetrated her eye. In all, her body had 24 stab wounds and 28 puncture wounds. These wounds had caused damage to her ribs, voice box, pericardial sac, heart, torso, neck, back, right jugular vein, right chest cavity, right lung, vertebral column, left kidney, abdominal cavity, and left buttock, and well as the tendons and muscles of her right hand. As noted, her ring finger had been detached from her hand, and she had damage to the adjacent third and fifth fingers. She had also suffered multiple blunt force injuries, including defensive wounds, to her head, face, arms, and torso. Her upper jaw was fractured, and teeth had been knocked out. The examining pathologist opined that the victim was alive, though not necessarily conscious, at the time these injuries were inflicted.

The victim had a telephone cord wrapped around her wrists and torso. There was a 10-inch tear on the front of her nightgown, which had been lifted above her waist. The evidence indicated that the assailant had made a forced entry through the back door, that a bloody struggle had occurred in the living room, that the assailant thereafter left bloody traces, including bloody footprints, throughout the house while looking for items to steal, and that the murder weapons were knives and tools found in the victim's home.

Defendant's grandmother lived across the street and three houses down from the victim's residence. Also living in the grandmother's house were defendant's mother, his brother, his aunt, and several other relatives. According to defendant's aunt, he sometimes lived with the family at his grandmother's house, but he was not living there on the day of Sarah's murder.

Around 6:00 p.m. on April 19, 1988, Oakland patrol officers Sullivan and Boyovich were parked on Kingsland Avenue. They spotted a burgundy Oldsmobile Cutlass that was on the stolen vehicle list. They stopped the vehicle, which was the victim's car. Defendant was driving. He was arrested. The interior of the Cutlass contained a small carving knife and a pair of red pants, as well as a radio-television and a videocassette recorder (VCR) that had been taken from the victim's home.

After initial resistance, defendant was handcuffed and placed in the police car. Once seated in the police vehicle, he volunteered that he had gotten the Cutlass from "a guy named Fred Bush."

Defendant was taken to the homicide division of the Oakland Police Department to be interviewed. Defendant's sweater had a bloodstain on its sleeve, and, when one of the interviewing officers arrived, the bloody shoes defendant had been wearing were sitting outside the interview room. The interview began around 9:25 p.m. on April 19 and lasted through much of the night, with periodic breaks.[3] Only a single portion was recorded. During the unrecorded initial segment, interrogating officers advised defendant they were investigating the theft of the Oldsmobile, and that a lady had been "hurt" in the incident. The officers read him his *Miranda* rights. He agreed to waive his right to silence, both orally and by initialing the written advisement form.

During the initial unrecorded segment, the officers asked defendant about the bloodstain on the sleeve of his sweater. Defendant said it was from a nosebleed. Defendant further stated the following: He lived with his grandmother, but was staying at the home of his girlfriend, Lisa Henry.[4] He was at his grandmother's between 2:00 p.m. and 3:00 p.m. on April 18, 1988, but arrived at Lisa's residence around 8:00 p.m. The next morning, April 19, he got up at 10:00 a.m. and went to 55th Avenue and Foothill Boulevard. There he met Fred Bush, who had the burgundy Oldsmobile Cutlass. Bush was trying to sell a small television and a VCR. He owed defendant $500 because, when defendant was arrested and jailed following an earlier fight between the two men, Bush or Bush's mother had taken defendant's jacket, which contained cocaine worth that sum. As a "fair trade" for the debt, defendant gave Bush two rocks of cocaine, worth $20 each; in return, Bush gave defendant the television and the VCR, and lent him the Cutlass until 11:00 that evening so he could take Lisa to a drive-in movie.

The recorded portion of the interview began at 10:07 p.m. At this time, defendant was re-*Mirandized*, and he agreed to continue speaking. During the recorded segment, defendant provided a more detailed version of the account he had previously given. Meanwhile, the officers learned that Fred Bush had

---

[3] As indicated below, defendant urges that his statements to the police, and to his girlfriend, Lisa Henry, at the police station, should have been suppressed on grounds that (1) he did not knowingly and voluntarily waive his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*)); (2) the statements were induced by trickery, and were thus involuntary; and (3) Lisa Henry was acting as a police agent when she elicited statements from defendant. The exact circumstances under which defendant made various statements to the police, and to Lisa Henry at the station, are discussed in greater detail in connection with these arguments.

[4] Hereafter, we sometimes refer to Lisa Henry as Lisa in order to differentiate her from her brother Germaine Henry, whom we generally identify hereafter as Germaine.

been taken into custody on April 7, 1988. (He would thereafter remain in the county jail until July 18, 1988.) Without telling defendant that Bush was in jail, the officers asked defendant to identify a picture of Bush. Defendant positively identified, and initialed, the picture.

The recorded session ended at 10:33 p.m.,[5] and the interview resumed at 11:29 p.m. Before this latter segment commenced, the officers advised defendant that the victim in the case they were investigating was dead.

In the renewed session, defendant conceded that his grandmother lived near the victim, Sarah LaChapelle, and that he knew Sarah's son, but he denied ever being inside the victim's house. An officer asked defendant whether anything had happened at his grandmother's residence on April 18, 1988. Defendant said he had gone there once that day to get money from his mother for a bus ticket, but she would not give him money. He had also gone to obtain his gun, and he went into his grandmother's room for that purpose. Told that two 911 calls had been made from his grandmother's address on that day (at 7:04 p.m. and 9:25 p.m.), defendant responded, "What if I did go back? But I didn't." Defendant insisted his family blamed him for everything and did not like him. When accused of lying, defendant muttered to himself, "Going to jail for the rest of your life, man."

At length, the officers confronted defendant with the facts that Fred Bush was in jail, defendant had been driving the victim's car and was in possession of property taken from her home, and he had bloodstains on his clothing and shoes. Urged to tell the truth in the face of this evidence, defendant responded, "Well, what's in it for me?" The officers indicated there would be no deals. In the early morning hours of April 20, 1988, defendant was arrested for Sarah LaChapelle's murder.

Later on the morning of April 20, and pursuant to a warrant, officers searched the residence where Lisa Henry lived with her father and her 15-year-old brother, Germaine. Among other things, the officers seized a watch, a chain necklace, and a Visa credit card in the victim's name. Lisa gave the watch and chain to police after an officer advised her they were looking for evidence that might have been taken in the homicide.

---

[5] The recorded portion of the interview was played for the jury.

When the search was complete, the police transported Lisa to the station to obtain a statement. Among other things, the officers asked whether defendant had given her some rings. Lisa said he had done so, but had subsequently taken them back.[6]

At the conclusion of an initial interview, Lisa was allowed to speak with defendant, who was in another interview room. There were several versions of how this visit came about, and of what defendant told Lisa. Sergeant Medsker, one of the interrogating officers, testified that Lisa asked if she could see defendant, was granted permission to do so, and spoke with him for about five minutes. Immediately thereafter, the officers questioned Lisa on tape about what defendant had said. In this recorded portion of the interview, which was played for the jury, Lisa stated that defendant had denied committing the crime, had ultimately agreed with Lisa's suggestion that "Freddie, Fred did it," and at one point had said he tried to stop Fred. Lisa indicated she had urged defendant to disclose who else was involved in hopes of receiving a lesser sentence, but defendant said he would have to stay in jail anyway.

At trial, when asked by the prosecutor if she had requested permission to see defendant, Lisa responded only that the officers said they would allow her to see and speak with him. On cross-examination, she denied having asked to see defendant.[7] Lisa testified that when she asked him about Fred, defendant "didn't say anything," and when she asked him what happened with a lady, he was "just vague" and "didn't really say." When the prosecutor sought to refresh her recollection by showing her the transcript of her taped police statement, Lisa claimed she had misspoken to the officers; they had mentioned Fred and she went into the room thinking Fred must have committed the crime, so after her visit with defendant, in which she did "all the talking," she just told them, "Fred did it."

Lisa further testified as follows: Defendant had stayed at her home off and on since the end of March, when he was discharged from the hospital after

[6] At trial, the victim's son, Anthony, testified that his mother always wore at least two rings, "a diamond ring and another little band." When officers executed the search warrant at Lisa's residence, they had asked her for "what [defendant] gave [her]," specifically including "the rings." In response, Lisa had given them the watch and chain, but told them she "didn't have any rings."

[7] The dispute over whether it was Lisa or the officers who instigated her visit with defendant is further illustrated by an exchange during the taped postvisit interview with Lisa. After obtaining Lisa's agreement that the officers had been talking to defendant for much of the night, and that they had encouraged him to tell the truth, Sergeant Paniagua, one of the interviewing officers, asked Lisa, "Did I tell you to do anything else?" Lisa answered, "No. You asked me just did I want to talk to him, maybe I can talk to him to convince him to tell the truth or to tell what happened." Paniagua responded, "Okay." (See discussion, *post.*)

being treated for gunshot wounds. He came to her house around 8:00 p.m. on April 18, 1988, but he did not stay the night. When he arrived, he was wearing acid-washed jeans with a red jacket. He subsequently left the house with Lisa's father. Her father returned later that evening, but defendant did not. Lisa saw defendant again the next morning; Germaine had let him in while Lisa slept. Defendant was still wearing the jeans and red jacket. The jacket had a matching pair of red leather pants. Lisa had seen defendant wear jeans under those pants before. Germaine wore the matching jacket and pants to school that day. That same morning, Lisa found a Chase Manhattan Visa card with the name "Sarah" in a paper bag on the kitchen table. Defendant gave her a watch, a necklace, a diamond wedding ring, and a diamond engagement ring. She did not ask where he got these items and assumed they were from his drug dealing activities. Later that day, defendant drove Lisa to the store in a burgundy Oldsmobile Cutlass. She asked where he had obtained the car, but he did not answer. During the drive, he asked her to give him back the rings; she did so. He dropped her off at her home around 6:00 p.m.

In his trial testimony, Germaine Henry admitted he had told police defendant arrived at the Henry residence on the morning of April 19, 1988, carrying a red jogging suit in a pillowcase. However, he disavowed this statement on the stand, saying the jogging suit had been in his possession for weeks. He testified he wore the suit on occasion, but could not remember wearing it on April 19. He admitted the pants legs had little soiled spots, as well as dirt that needed to be wiped off.

Thereafter, Germaine's tape-recorded statement to the police was admitted in evidence and played for the jury. In this statement, Germaine recounted the following: Defendant was not at the Henry residence on the evening of April 18, 1988, but arrived the next morning carrying a red jogging suit in a pillowcase. Germaine wore the suit to school that day (Apr. 19) after wiping dirt off the pants legs. When he left for school, a burgundy-colored car was parked outside the house. When he got back from school, Lisa was wearing a watch, and defendant showed Germaine a ring, which Germaine put on his finger and then returned to defendant.

Defendant's aunt, Mamie Jackson, lived with defendant's grandmother on Hesket Road. Jackson testified as follows: Defendant came to the house in the late afternoon or early evening of April 18, 1988. He was wearing a red jogging suit. Jackson was not present when defendant left the house later that night, but when she next returned, the grandmother's room appeared to have been ransacked. The next morning, the victim's husband, Sylvester LaChapelle, called Jackson and asked if she could see Sarah LaChapelle's Oldsmobile Cutlass parked in Sarah's driveway. Jackson walked across the street to check, saw the car was not there, and relayed this information to Sylvester.

Serological evidence indicated that the pants of the red leather jogging suit and the sleeve of defendant's sweater both contained type B human blood, found in 19 percent of the Black population. The victim had type B blood; defendant has type O blood. Other genetic markers in the blood on the sweater were consistent with the victim's blood and appear in about 1.2 percent of the Black population. Other genetic markers in the blood on the red pants were also consistent with the victim's blood and appear in about 11 percent of the Black population.

According to the prosecution criminologist, the bloodstains on the pants were both "transfer-type" and "spatter" stains. The criminologist described the latter as "blood in flight." There was also blood on the jacket of the red jogging suit, and on the tops and tongues of defendant's Fila tennis shoes. The print of one of these shoes matched a bloody shoeprint found at the crime scene.

### 2. *Defense case.*

An Oakland Police Department fingerprint specialist testified for the defense that he could obtain no fingerprint match with defendant for prints taken from the crime scene, the victim's car, or various items seized from the victim's house.

Defendant testified in his own behalf and denied killing Sarah LaChapelle. He gave the following account: He went to his grandmother's house between 4:00 p.m. and 5:00 p.m. on April 18, 1988. He was wearing Fila tennis shoes and a red leather jogging suit over acid-washed jeans and a sweater. He sought to obtain a gun, and also wanted his grandmother to give him money for a bus ticket, because he had learned that the man who had shot him the previous month was after him again. His grandmother did not have enough money to give him. He went into her bedroom without permission and opened drawers to look for a firearm, but he did not ransack the room. He found a .38-caliber revolver under the bed and put it in his belt. As he left, after a stay of about 40 minutes, he heard his name broadcast on his grandmother's police scanner. Because he was on probation for prior weapons offenses, and feared the police might catch him with the revolver, he hid it on a shelf in his old clubhouse adjacent to his grandmother's garage. Then, carrying the scanner, he jumped over her fence.

Still listening to the scanner, defendant walked along a creek to Hegenberger Road, getting mud on his pants and shoes in the process. Eventually he took a bus to Lisa Henry's house, where he rinsed off his pants with a hose. He changed shoes and socks, putting on a different pair of Fila tennis shoes that belonged to Germaine. Lisa's father, Reginald Henry, then drove

defendant to look for drugs defendant had hidden. When they could not find the drugs, they went to a liquor store and bought beer. They sat in the parking lot, drinking the beer, for about 40 minutes. Then they drove back to the Henry house. Reginald went inside, but defendant did not.

After several more stops, including one to purchase wine, defendant returned to his grandmother's house to retrieve the gun. He was not sure when he arrived there. This time, he did not go into the house. He proceeded to his old clubhouse, obtained the gun, and stayed for about 15 minutes, finishing the wine.

As he walked toward the front of his grandmother's property, defendant observed two men, whom he had seen before, coming out of Sarah LaChapelle's house. One was carrying a box and the other a pillowcase. The man with the pillowcase saw defendant, dropped the pillowcase, and ran. Both men were Black. One was tall and had a light complexion.

Defendant looked inside the pillowcase and saw a VCR and a television. The front door to the victim's house was open, and he entered the residence. There he found the victim dead and the house in bloody disarray. He tried to see if the victim was breathing, but was distracted when he heard a noise at the back door. He reached for his gun and dropped it beside the victim's body. He picked up the gun, went to the back door, and saw that it had been kicked in. Because Germaine's shoes were two sizes too small, he was wearing them like slippers, and one fell off.

Defendant wiped his gun off with a towel. He took the victim's car keys, the television, the VCR, and other items, and drove away in her Oldsmobile. He did not call the police to report that she was dead. Nor did he impart this information to his grandmother.

After leaving the victim's house, defendant drove aimlessly. He threw away his bloody socks, and finally fell asleep in the Oakland hills. The next morning, he drove to Lisa Henry's residence. He took off his leather pants, put them in the pillowcase containing the television and the VCR, took the pillowcase into Lisa's house, and put it in a closet. Germaine asked if he could wear the red leather jogging suit to school, and defendant agreed. He retrieved the red pants from the pillowcase and gave them to Germaine. He did not realize there was blood on them.

After taking a shower, defendant examined the pillowcase's contents. Along with the television and the VCR, it contained a watch, a chain necklace, some rings, and a paper bag with a credit card inside. He gave the chain, watch, and rings to Lisa, then went to sleep on the floor.

Later, defendant drove Lisa and her friend Yolanda to the supermarket. They dropped off some medicine for Yolanda's mother and returned to Lisa's house. Defendant then placed the television and VCR in the trunk of the Oldsmobile and drove to the apartment of his friends Roshan and Judo, intending to sell the items. However, he began drinking and talking with his friends and did not get around to selling the television and the VCR.

On his way back to Lisa's house, defendant picked up his friend Arnold Haney. Defendant cooked a pizza for himself and Arnold, but Lisa came home and demanded that Arnold, whom she disliked, leave the house. Defendant and Arnold ate the pizza in the car. Defendant then returned to the house, where Germaine gave back the red leather pants he had worn to school. Lisa started an argument that escalated as she and defendant drove around in the Oldsmobile. Finally, she threw at him the rings he had given her. He put the rings in the car's ashtray, dropped Lisa off, and drove away. He removed the television and the VCR from the trunk and placed them in the passenger compartment, intending to sell them. While he was stopped at an intersection on Kingsland Avenue, an acquaintance approached and inquired about purchasing drugs.

Police had been sitting in a parked patrol car on Kingsland Avenue. At this point, they jumped out of their car and pointed guns at the two men. After defendant complied with their orders to put his hands through the window, crawl out onto the ground, and place his hands on his head, one of the officers kicked him while handcuffing him. In the police car following his arrest, defendant falsely told Officer Sullivan that he got the Oldsmobile from Fred Bush. He lied because he held a grudge against Bush. Two months earlier, he and Bush had gotten into a fight that led to defendant's being arrested and jailed. When defendant fled from the fight, Bush grabbed defendant's jacket, the pockets of which contained rock cocaine, and gave it to a family member. This incident caused defendant to think of Bush as his enemy.

At the homicide division, the police took defendant's shoes, and he was placed in an interview room, where Sergeants Medsker and Paniagua questioned him. They read defendant his rights, and he agreed to talk, but he did not know why. When asked where he got the Oldsmobile, he repeated the lie about Fred Bush because he had already told that story to Sullivan. Moreover, he did not think the truth would help and, in any event, he disliked Medsker, whom he knew from a previous investigation into the murder of defendant's friend. He also lied about getting the VCR and television from Bush in exchange for two rocks of cocaine, and lied by denying that he went into Sarah LaChapelle's house. When he told these falsehoods, he did not know he was going to be charged with homicide.

B. *Penalty trial.*

1. *Prosecution case.*

In aggravation of penalty, the prosecution presented evidence of three other instances of defendant's violent criminal conduct (§ 190.3, factor (b)):

In March 1986, following a traffic accident between a truck he was driving and a car, defendant pointed two guns at the car's owner, then pursued the other vehicle at high speed, rammed it twice with the truck, fired three shots at the car, and, when finally cornered on foot by California Highway Patrol officers, initially resisted their orders and made movements as if to draw the two handguns in his belt.

In September 1987, defendant resisted arrest after a traffic stop by punching the officer's shoulder, challenging the officer to a street fight, and then rushing at the officer, whereupon the officer was forced to fell defendant with his baton.

In February 1988, several days after his fight with Fred Bush, defendant approached Bush's sister, Marlena Brown, hit her in the face with the back of his hand, placed her in a chokehold, and forced her to telephone Bush under threat that if she did not do so, he would shoot her.

The prosecution presented a single victim impact witness, Sarah LaChapelle's son Anthony. Anthony testified as follows: His son, age 11, and daughter, age 7, were both severely affected by Sarah's death. The mention of grandparents in the children's presence now caused them to cry, so the adults in the family avoided talking about the victim in front of the children. Anthony often dreamed about his mother. Since her death, he could not accomplish anything or face his friends. He began to drink heavily and was arrested for drunk driving. His friends advised him to hunt down and kill his mother's murderer. To get away from his friends, he moved to Los Angeles, where he again was arrested for drunk driving and spent time in jail. While he was in jail, his father passed away. Because of the loss of his parents, Anthony had trouble making business decisions, and he lost his contracting business.

As to his feelings about defendant, Anthony said, "Even now I want to get this guy. I want him to die, so I hope the law gets him for me."

2. *Defense case.*

Defendant presented an extensive case in mitigation. His mother, father, paternal grandmother, and various friends, acquaintances, school officials, and

juvenile justice workers testified at length about his family, his childhood, his educational difficulties, and his troubles with the law. A marriage and family counselor testified about the effects of child abuse on mental and psychological development.

Regarding defendant's childhood and family background, his mother, Rosia Carter, testified as follows: Defendant was born out of wedlock in 1967. At one point, Rosia had tried to abort the pregnancy by taking quinine and mustard powder. Defendant's father, Gregory Tate, Sr., ultimately married another woman and was involved only intermittently in defendant's life. Rosia was physically abused by Gregory, Sr., and by her husband, Wayne Carter. Defendant also suffered childhood physical abuse at the hands of these men, who used drugs such as heroin and cocaine. Among other things, Carter treated defendant harshly about defendant's bedwetting problem, which did not go away until the sixth or seventh grade. Carter was involved in criminal drug activities and went to prison twice during his marriage to Rosia. During Carter's second prison term, Rosia divorced him. In his teenage years, defendant was affected by the deaths of a cousin, Clifton Spencer, who was fatally stabbed; a neighborhood youth, Willis Reed, who died in a shed fire in Rosia's backyard; a friend, Antoine Martin, who died in defendant's arms after a driveby shooting; and defendant's maternal grandfather, who had been a constructive force in the family. After the grandfather's death, the family "fell apart." Several relatives developed drug problems, and there were physical fights in which defendant was sometimes involved. At age 17, defendant tried to hang himself in Rosia's backyard, got into an altercation with responding police officers, then fled. The officers opined he might be trying to make them kill him.[8] Once during a violent argument with Rosia, defendant blamed his upbringing for his life of crime and drugs.

Further details of the family background were supplied by Gregory, Sr., and defendant's paternal grandmother, Zelma Richard. Both confirmed that Gregory, Sr., dropped out of high school, married another woman, Pat Davis, in 1969, entered the military, was sent to Vietnam, and came back addicted to heroin. Gregory, Sr., recalled a 1968 incident, to which Rosia had also alluded, in which Rosia stabbed Davis during a street altercation, causing Gregory, Sr., to slap Rosia.

Gregory, Sr., recounted his further abuse of marijuana and alcohol, and admitted he supported his drug habits with crime. He confirmed that during the two periods he and Rosia lived together, they fought, and he hit her. They

---

[8] A juvenile probation officer confirmed the attempted hanging, which occurred on November 7, 1984. According to the probation officer, Rosia indicated that defendant was depressed over the deaths of friends and relatives. As a result of this incident, defendant was referred for psychiatric treatment, a standard procedure.

argued about how defendant was being raised; Gregory, Sr., thought Rosia was overprotective and too lenient. Gregory, Sr., recounted that when defendant was 17 years old, he briefly lived with Gregory, Sr., in Seattle after escaping from a juvenile camp. Gregory, Sr., was then living in Seattle to avoid arrest for a parole violation.

Richard observed signs that defendant was an angry child who was getting into trouble in school and with the law. Like Gregory, Sr., she believed Rosia was too lenient. When defendant was a teenager, Richard tried to get him to work or go to school, and she enrolled him in a trade school, but he did not attend. She generally considered defendant to be smart, helpful, and respectful.

A friend of Rosia's and a jail acquaintance of Wayne Carter's confirmed the physical abuse Rosia suffered from both Carter and Gregory, Sr. A crisis intervention counselor recalled Rosia's efforts to place defendant, then eight years old, in a residential school because he was disobeying, fighting, and stealing. The counselor sensed that Rosia was rejecting defendant.

Three men, all of whom were serving prison terms at the time they testified, recounted their relationships with defendant as a child and youth. Their testimony indicated that defendant began drinking beer, smoking, stealing, and committing burglaries as early as age six; was smoking marijuana by the fourth grade; "hung out" with older people in an effort to "fit in"; had a violent temper and a "don't care" attitude; and engaged in fights. One of these witnesses opined that defendant was affected by the deaths of Willis Reed, defendant's friend Antoine Martin, and defendant's maternal grandfather.

Numerous witnesses detailed defendant's educational history. Rosia testified that she enrolled him in kindergarten a year early, but he was already having problems by the first grade. He transferred elementary schools several times. He was smaller than the other children, and tended to act aggressively toward them. He was easily distracted and may have been diagnosed with dyslexia. When learning disabilities caused his one-year transfer in third grade to a school with smaller class sizes, neighborhood children teased him about going to and from school on a "special bus." Back in his regular school, he had to repeat fourth grade. During this time, Rosia took him to juvenile authorities to see if they could talk to him before he got into trouble. She tried to place him in a residential school, but it already had one student with the same learning disability and could not take another. She took defendant for counseling, but he resisted, and the counselor could not break through. Defendant took some special education classes during junior high school. He was expelled for the remainder of the school year during seventh

grade when a friend brought a pellet gun to school. Things improved somewhat in ninth grade after defendant's transfer to yet another school. He joined the gymnastics team in 10th grade, but a foot injury ended his participation.

Teachers, an administrator, a psychologist, and a counselor who had contact with defendant while he attended public school testified about his behavior, attitude, grades, and test scores. These witnesses variously confirmed that, throughout much of his school career, defendant performed poorly, and he attended special classes for educationally handicapped students. In February 1975, when he was in the third grade, he attained an IQ score of 96, within the average range. Had the tester known defendant was only eight years old instead of nine, the score would have been higher. In separate evaluations during each of his fourth grade years, defendant tested well below grade level in reading, though his math scores were solidly at grade level. In seventh grade, after he was suspended for receiving a pellet gun from another student and was placed on home instruction for the remainder of the year, defendant received all failing grades. He did earn some B's and C's during his ninth grade year.

According to several witnesses, defendant was hot tempered and aggressive, often involved in fights with other students, and a frequent disciplinary problem. One teacher perceived him as a bully, while another reported that, though not a high achiever, he could behave when strict control was maintained. The individual education plan, or IEP, prepared for defendant early in his school career indicated he had visual-motor integration and reading disabilities, was overactive, and lacked impulse control. The IEP also suggested he had emotional problems.

There was evidence that Rosia's parenting methods, and her ambivalent attitudes toward defendant, contributed to his school problems. An elementary school teacher thought Rosia believed defendant's difficulties were the school's fault. A high school dean testified that, when he suspended defendant for fighting, Rosia at first asserted she did not believe defendant was involved in the incident, and she threatened to kick the dean's "ass," though she later came to accept defendant's complicity. One witness was a clinical psychologist who, as a graduate psychology student, had evaluated defendant during his third grade year. She testified Rosia told her, in front of defendant, that he resembled his father, that he was "evil," and that Rosia whipped him to make him angry enough to fight other children when that became necessary.

A juvenile probation officer testified about defendant's contacts with the juvenile justice system in 1983 and 1984, when he was 16 and 17 years old. According to this witness, defendant was arrested for battery in November

1983, but the district attorney deemed the incident mutual combat, and defendant was released to his stepfather, Carter. Defendant was arrested for burglary in early December 1983, but no wardship petition was filed, and he was released to his mother. Two weeks later, he was arrested on another burglary charge; he was declared a court ward and released to his mother under home supervision. In February 1984, he was arrested for yet another burglary and committed to a county juvenile camp. He twice walked away from this camp, but surrendered both times.

Finally, a licensed marriage and family counselor provided expert testimony about the nature of child abuse, the effects it can have on family dynamics, and the development, behavior, and maturity of one who has suffered it.[9] The witness indicated the following: Child abuse is an act or omission by a parent that is developmentally inappropriate and damaging to the child. A child can suffer physical, sexual, or psychological abuse, and parental neglect can also qualify as abuse. Psychological mistreatment can include rejection of the child, singling a child out for negative treatment, wishing the child had not been born, or terrorizing a child. Symptoms can include fistfighting by a young child and bed-wetting by an older child, though the latter problem may also have a physiological origin. The long-term effects of childhood abuse can include cognitive difficulties, poor school performance, impulsive behavior, alcohol and drug abuse, "acting out" behavior, aggressiveness, running away from home, depression, and suicide. People who were abused as children often become immature adults prone to temper tantrums. There is also a correlation between child abuse and a "conduct disorder," a diagnosis that may apply to one who breaks the law before age 18. In the 1970's and 1980's, child abuse often was not identified, and even if identified, the treatment may not have been effective.

## II. DISCUSSION

A. *Jury selection issues.*

1. *Restrictions on voir dire.*

Defendant claims that by refusing to allow questioning of prospective jurors about whether they would automatically vote for the death penalty in light of certain specific facts about Sarah LaChapelle's murder, the trial court risked empanelling a juror who, though perhaps open to either the death penalty or life without parole in some cases, would vote for death *in this case* without regard to the mitigating evidence. The court's ruling, defendant

---

[9] This witness had not personally examined defendant or reviewed his records, and did not offer a diagnosis of defendant.

urges, violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and analogous provisions of the California Constitution. We find no error.

The pertinent procedural facts are as follows: Prior to trial, defendant's counsel submitted a proposed script to be used by the court in questioning jurors during the death qualification voir dire.[10] This script first advised a prospective juror that he or she was to hear a summary of the accusations against defendant in order to make voir dire more meaningful. The script then instructed the prospective juror not to assume the trial evidence would prove the accusations beyond reasonable doubt, not to draw inferences about defendant's guilt or innocence from the summary, and that guilt or innocence was a jury question to be decided on the basis of the evidence. After setting forth these admonitions, the script asked the prospective juror whether, if it were proved beyond reasonable doubt that (1) defendant kicked in the victim's back door and entered her home with intent to rob, (2) he murdered the victim during that burglary and robbery, (3) the victim died of multiple stabbing and puncture wounds and multiple blunt instrument blows, (4) defendant severed the victim's ring finger and took her wedding rings, and (5) the victim's adult son discovered her body, the prospective juror would automatically impose either death or life without parole as a penalty.[11]

---

[10] It is undisputed that jury selection in this case was conducted in the same manner as in *People v. Cash* (2002) 28 Cal.4th 703 [122 Cal.Rptr.2d 545, 50 P.3d 332] (*Cash*): Each prospective juror was questioned individually, and out of the presence of other members of the venire, to determine his or her qualifications to serve on a capital jury. (See *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301].) This was followed immediately by voir dire of the same prospective juror concerning his or her general qualifications. In each instance, the prospective juror was questioned first by the court and then, in turn, by each counsel. After each step, the court entertained challenges for cause. All prospective jurors who survived this phase were directed to return at a later date. When they assembled on this date, they were called into the jury box according to randomly assigned numbers, whereupon the court entertained the parties' peremptory challenges. (*Cash, supra,* at pp. 718–719.)

[11] At trial, and in their briefs, the parties have repeatedly labeled a death qualification voir dire question of this type as a "*Fields* question," a reference to *People v. Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680]. Contrary to defendant's suggestion, however, that decision never provided significant support for the notion that a capital defendant has the right to probe prospective jurors about their penalty attitudes with respect to specific factual details about the particular case to be tried. In *Fields,* the defendant urged that, under *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] (*Witherspoon*), a pro-life or pro-death prospective juror could be disqualified on that ground only if he or she would automatically apply the preferred penalty in *every* capital case. Hence, the defendant argued, he was entitled to rehabilitate prospective jurors who had indicated they would automatically vote for life in the particular case by determining whether there were *hypothetical* cases (such as Hitler's murder of six million Jews) in which they would consider the death penalty. We rejected that contention, holding that a prospective juror was excludable if he or she had stated an inability to consider death in the specific case. (*Fields, supra,* at pp. 353–358.) The

The defense proposal was extensively argued over three separate hearing dates, during which the court considered several alternatives. At the initial hearing, on September 3, 1992, the prosecutor objected that the defense's proposed question was "too detailed" and invited prospective jurors to prejudge the evidence. The court offered the prosecutor the chance to draft an alternative, and he agreed to do so.

The court took the matter up again on September 8, 1992. Having reviewed the prosecutor's draft,[12] the court proposed its own question. With the prosecutor's approval, this version included reference to the assumed facts that a woman was robbed, stabbed, *and bludgeoned* to death in her own home. Defense counsel urged that this was inadequate because it left out the most serious piece of aggravating evidence, i.e., that the victim's finger was severed. The court responded that it intended to omit this latter detail because whether, and why, the finger was severed was a jury issue. The court said that if a severed finger were mentioned, it would "invit[e] inquiries from the jurors why that is significant, and so then we are going to have to be feeding them more and more of the facts of this case, and we are asking them to prejudge the evidence."

The matter was continued again for two days, during which the court researched and considered the issues further. In its final ruling, on September 10, 1992, the court retreated from its September 8 position, and determined that death qualification inquiry about prospective jurors' case-specific penalty attitudes should be confined to matters embodied in the accusatory pleading. The court said it would read the information to the prospective jurors, and then would ask whether both penalties would be open if defendant was convicted of first degree murder, and the jury further found true the robbery-murder and burglary-murder special circumstances and that a deadly weapon was used. In addition, the court ruled, counsel could question prospective jurors about the effect on their penalty attitudes of (1) the felony-murder rule, (2) the fact that the victim was a woman, and (3) the fact that a knife was used in the murder.

On the other hand, the court indicated, it would not allow counsel to explore such details as that the victim was bludgeoned to death and was

---

prospective jurors at issue in *Fields* had indicated they would refuse to vote for death in response to the court's question whether they would do so " 'in [a] case *involving these charges and special circumstances.*' " (*Id.* at p. 354, some italics omitted.) We did not suggest in *Fields* that voir dire may or must go beyond the charges and special circumstances to highlight gruesome or inflammatory details about the case that might persuade an otherwise pro-life juror to consider death. A fortiori, *Fields* does not stand for the proposition that gruesome details beyond the bare charges may be highlighted during death qualification voir dire to determine whether prospective jurors who indicate a willingness to consider both penalties in the abstract would nonetheless automatically vote for death in the particular case.

[12] This draft is not included in the record.

stabbed multiple times and that, when found by her son, she was nude below the waist and a finger was severed. The court expressed the view that, under *Witherspoon, supra,* 391 U.S. 510, death qualification was concerned with a prospective juror's penalty attitudes *in the abstract* and should not focus on the specific facts of the case at hand. Questions that went into great detail about the facts of the particular case, the court remarked, improperly sought to "indoctrinate[] the juror" and get the "juror to vote in a specific way."

■ We have had several recent occasions to summarize the relevant law. At the time of trial, as now, a prospective juror could be excluded from service on a capital case if the person's attitudes toward the death penalty would prevent or substantially impair his or her ability to follow the court's instructions and the juror's oath. (*Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*) [clarifying that exclusion is permitted under broader circumstances than those previously specified in *Witherspoon, supra,* 391 U.S. 510, 522, which allowed exclusion where a prospective juror made "unmistakably clear" that he or she would "*automatically*" vote for or against the death penalty].) In the process of determining prospective jurors' capital case qualifications, the court has considerable discretion to place reasonable limits on voir dire (*People v. Carasi* (2008) 44 Cal.4th 1263, 1286 [82 Cal.Rptr.3d 265, 190 P.3d 616] (*Carasi*); *People v. Zambrano* (2007) 41 Cal.4th 1082, 1120 [63 Cal.Rptr.3d 297, 163 P.3d 4] (*Zambrano*)) and to determine the number and nature of voir dire questions (*Carasi, supra,* at p. 1286; *People v. Stitely* (2005) 35 Cal.4th 514, 540 [26 Cal.Rptr.3d 1, 108 P.3d 182] (*Stitely*)).

"[D]eath-qualifying voir dire seeks to determine prospective jurors' attitudes about capital punishment only in the abstract, and whether, without knowing the specifics of the case, they have an open mind on penalty. (*Zambrano, supra,* 41 Cal.4th [1082,] 1120, quoting *People v. Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr. 399, 789 P.2d 127].)" (*Carasi, supra,* 44 Cal.4th 1263, 1286.) Thus, "as we have said on many occasions, '[d]efendant ha[s] no right to ask specific questions that invite[] prospective jurors to prejudge the penalty issue based on a summary of the aggravating and mitigating evidence ([*Cash, supra,*] 28 Cal.4th 703, 721–722 . . . .), to educate the jury as to the facts of the case (*People v. Sanders* (1995) 11 Cal.4th 475, 538–539 [46 Cal.Rptr.2d 751, 905 P.2d 420]), or to instruct the jury in matters of law (*People v. Ashmus* (1991) 54 Cal.3d 932, 959 [2 Cal.Rptr.2d 112, 820 P.2d 214]).' (*People v. Burgener* (2003) 29 Cal.4th 833, 865 [129 Cal.Rptr.2d 747, 62 P.3d 1]; see also, e.g., *People v. Mason* (1991) 52 Cal.3d 909, 939–941 [277 Cal.Rptr. 166, 802 P.2d 950] . . . .)" (*Zambrano, supra,* at p. 1120.)

"Nevertheless, voir dire cannot be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair their

performance under *Witt, supra,* 469 U.S. 412, 424. Rules have developed to balance the competing interests." (*Carasi, supra,* 44 Cal.4th 1263, 1286.) The gist of these rules is that the defense cannot be categorically denied the opportunity to inform jurors of case-specific factors that could *invariably* cause an otherwise reasonable and death-qualified juror to vote for death regardless of the strength of the mitigating evidence. (*Id.* at pp. 1286–1287; *Zambrano, supra,* 41 Cal.4th 1082, 1120–1123; *People v. Roldan* (2005) 35 Cal.4th 646, 693–694 [27 Cal.Rptr.3d 360, 110 P.3d 289] (*Roldan*); *People v. Vieira* (2005) 35 Cal.4th 264, 285–286 [25 Cal.Rptr.3d 337, 106 P.3d 990]; *Cash, supra,* 28 Cal.4th 703, 721.)

In *Cash, supra,* 28 Cal.4th 703, "our lone reversal for limiting death penalty inquiry into case-specific facts" (*Carasi, supra,* 44 Cal.4th 1263, 1286), we concluded that such a reaction might be engendered by anticipated penalty phase evidence—mention of which the trial court had categorically excluded at all phases of voir dire—that, as a juvenile, the defendant had murdered his grandparents. (*Cash, supra,* at p. 723.) On the other hand, in *Roldan, supra,* 35 Cal.4th 646, we found no facts so similarly inflammatory that reliance on *Cash* was appropriate. The *Roldan* evidence suggested that, after the defendant and an accomplice robbed participants in a swap meet, then fled, the defendant reappeared and fatally shot a swap meet employee who had chased and caught the accomplice, even though the victim complied with the defendant's order to release the accomplice. (*Roldan, supra,* at pp. 663–664.) Seeing no need for specific voir dire on details such as these, we explained that *Roldan* involved "no prior murders, no sensational sex crimes, no child victims, no torture." (*Id.* at p. 694.)[13]

Here, defendant renews his contention that his counsel should have been allowed to question prospective jurors about anticipated evidence that the murder victim, Sarah LaChapelle, was bludgeoned as well as stabbed, and in particular, that her ring finger had been severed. However, we find no abuse of the trial court's broad discretion.

Closely on point in this regard is our recent decision in *Zambrano, supra,* 41 Cal.4th 1082. There the information charged that the defendant, using a dangerous and deadly weapon, had committed the attempted murders, with great bodily injury, of a Berkeley couple, the Mishells. The information further asserted that the defendant had committed the first degree murder of Luis Reyna, inflicting great bodily injury. As to Reyna's murder, the information alleged a witness-killing special circumstance. The prosecution intended

---

[13] In *Carasi, supra,* 44 Cal.4th 1263, we assumed for purposes of argument that premeditated murder while lying in wait and for financial gain is a "potentially inflammatory circumstance[] analogous to multiple murder and prior murder . . . that . . . could transform an otherwise death-qualified juror into one who could not decide penalty fairly . . . ," but we did not decide that issue. (*Id.* at p. 1287.)

to introduce evidence that the defendant, a successful contractor and local official, bludgeoned the Mishells, a University of California professor and his wife, in their home because he thought they had exposed his extramarital affair, and that he murdered Reyna, a friend and colleague, to prevent the victim from testifying against defendant in the Mishell case. There would also be evidence that the murder victim's body was found in an isolated hilly area, decapitated and dismembered.

The trial court indicated that, for purposes of death qualification, it would read aloud, and paraphrase, the information for the prospective jurors, and would permit counsel to question them with respect to the community status of the defendant and the victims, and the location of the Mishell assaults, but would not grant the defense request to explore the issue of dismemberment. To ask prospective jurors about their reaction to the "method of killing," the court explained, would be inviting them to prejudge the case.

█ On appeal, we upheld the trial court's ruling as a valid exercise of its broad discretion. Distinguishing *Cash*, we held that "[t]he sole fact as to which the defense unsuccessfully sought additional inquiry—the condition of the adult murder victim's body when found—was not one that could cause a *reasonable* juror—i.e., one whose death penalty views *otherwise* qualified him or her to sit on a capital jury—*invariably* to vote for death, regardless of the strength of the mitigating evidence." (*Zambrano, supra,* 41 Cal.4th 1082, 1122.) We acknowledged that a normal juror would certainly be affected by the condition in which the victim's body was found, "as by any brutal circumstance of a criminal homicide. But the fact of dismemberment, in and of itself, does not appear so potentially inflammatory as to transform an otherwise death-qualified juror into one who *could not* deliberate fairly on the issue of penalty." (*Id.* at p. 1123.)

Similarly here, the fact that Sarah LaChapelle was beaten as well as stabbed, though affecting, is not outside the realm of "brutal circumstance[s]" that might be expected in a trial for capital homicide. And if dismemberment of the victim's body in *Zambrano* was not a detail so gruesome, sensational, and inflammatory that it could cause a reasonable, otherwise qualified capital juror *invariably* to vote for the death penalty, the victim's severed finger in this case also does not qualify for that status.

Defendant urges that, in *Zambrano*, we made a point of noting there would be no evidence the murder victim might have been dismembered *while alive*, and thus perhaps was tortured. By contrast, defendant notes, the prosecution here presented evidence that the victim was likely alive, though not necessarily conscious, when the various injuries to her body, including the severed finger, were inflicted. But again, capitally charged homicides are often brutal.

Since the victim was alive at the time she was stabbed to death—a detail prospective jurors *would* learn—it seems unlikely a reasonable, otherwise qualified juror would focus on the additional pain and suffering represented by the severed finger as a basis for refusing to consider any penalty but death. Of course, many would deem it offensive that a robber-murderer cut off the victim's finger in a crass effort to obtain her rings. But that alone does not seem calculated to transform an otherwise fair juror into one who would vote for death regardless of the mitigating evidence.

Defendant's proposed script for death qualification voir dire included various admonitions against prejudgment, but it would nonetheless have invited prospective jurors to focus on specific details about the case at the outset, and to begin to form judgments and opinions about the appropriate penalty in advance of hearing the trial evidence. The trial court properly sought to avoid such a situation. The court did not abuse its broad discretion in denying inquiry on the subjects about which defendant now complains. His contention lacks merit.

### 2. *Hardship excusal of Prospective Juror R.W.*

Defendant contends the trial court improperly excused Prospective Juror R.W., despite defense counsel's refusal to stipulate to the excusal, on grounds R.W. was a full-time student. Defendant claims the excusal was not permitted, under the governing statute and rules, because R.W. did not affirmatively request to be excused and because the record does not show R.W. faced hardship sufficient to justify an excusal. The error, defendant asserts, implicates his federal and state constitutional rights to a fair and impartial jury drawn from a representative cross-section of the community. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16.) We are not persuaded.

The pertinent facts are as follows: On September 10, 1992, at the outset of jury selection, the trial court directed introductory remarks to the entire venire. Among other things, the court explained that the trial would begin in early December, and could take as long as four weeks, not counting jury deliberations or the hiatus that would occur between the guilt phase and any penalty phase. The daily trial schedule, said the court, would generally be from 1:30 p.m. to 4:30 p.m. on Mondays and Wednesdays, and from 11:00 a.m. to 4:30 p.m. on Tuesdays and Thursdays, with Fridays off. The court further indicated that, because it was responsible for empanelling a fair and impartial jury, an excusal from service on the case would not be easy to obtain, but the court nonetheless would consider certain kinds of hardship excuses, including significant loss of employment income, prepaid vacations, medical problems, and full-time student status. The court said it would take up any prospective juror's hardship issues during individual voir dire.

During the subsequent individual voir dires, counsel stipulated to, and the trial court granted, hardship excusals to students L.S. and A.K. On her juror questionnaire, Prospective Juror L.S., a self-identified 22 year old with strong pro-death-penalty views, had indicated she was "currently attending" California State University, Hayward (Cal State Hayward).[14] In response to a question about her "job status," she had circled "full-time student," and had handwritten that she "[c]an't afford to miss my classes cuz it's already been paid for." During voir dire, the court obtained L.S.'s oral representation that she would be taking 17 units at Cal State Hayward,[15] and that her class schedule primarily fell during daytime weekday hours. Defense counsel indicated she would stipulate to L.S.'s excusal, and the prosecutor concurred. The court excused L.S., advising her that "we are going to excuse you for hardship. We don't want to interrupt your schooling."

On his juror questionnaire, Prospective Juror A.K., self-described as 34 years old and with strong pro-life views, had indicated he was a full-time student pursuing a master's degree in clinical psychology at the University of California, Berkeley. When A.K. appeared for individual voir dire, the court placed on the record that he had supplied official verification of his student status and advised him that "because of your school commitment, . . . both sides have stipulated you can be excused."

Thereafter, the court conducted individual voir dire of Prospective Juror R.W. On his juror questionnaire, R.W. had described himself as 19 years old, and had indicated that a life sentence was preferable to the death penalty in all but "severe" cases. Like L.S. and A.K., he had circled "full-time student" on his questionnaire. He indicated he was studying criminal justice at Cal State Hayward. During his death-qualification voir dire, R.W. confirmed that he was open to the death penalty in "severe" cases like serial or multiple murder, and said he could also consider it in this single-murder case because the victim was stabbed to death.

While examining R.W. during the immediately following general voir dire, defense counsel asked what R.W. intended to do with his criminal justice major. At this point, the following colloquy occurred: "The Court: Can I interrupt for just a second? Are you still in school, Mr. [W.]? [¶] Prospective Juror Mr. [W.]: Yeah. [¶] The Court: Are you a full-time student? [¶] Prospective Juror Mr. [W.]: (Nods head.) [¶] The Court: You are a full-time student? [¶] Prospective Juror Mr. [W.] Yes. [¶] The Court: Where are you going? [¶] Prospective Juror Mr. [W.]: Cal State Hayward. [¶] The Court: Cal State Hayward. And how many units are you taking? [¶] Prospective Juror

---

[14] This institution has since been renamed California State University, East Bay. We use the prior name for convenience and clarity.

[15] Voir dire of L.S. took place on September 14, 1992, at the beginning of the school term.

Mr. [W.]: Seventeen. [¶] The Court: And you're in school right now; right? [¶] Prospective Juror Mr. [W.]: Yeah."

At this point, defense counsel interjected, "There hasn't been any complaint about that. We don't have anything written about that." The court responded, "But I'll accept it." Defense counsel then asked R.W. if he had a problem sitting on a jury for a trial that might take one or two months. R.W. answered, "It depends on the time schedule." Counsel repeated the day-to-day schedule the court had given earlier, Tuesdays and Thursdays 11:00 a.m. to 4:30 p.m., Mondays and Wednesdays 1:30 p.m. to 4:30 p.m., with Fridays off. The court added, "Plus you may be deliberating all day for three or four days or longer. I don't know. [¶] The point is, Mr. [W.], we don't want to screw up your semester at school." Defense counsel argued, however, that if the trial schedule could work around R.W.'s school schedule, "and [if] he is not claiming a hardship, we don't have to insist that he take it."

At this point, the prosecutor indicated he would stipulate to R.W.'s excusal. However, defense counsel stated she would not do so, and "want[ed] to hear what [R.W.] has to say." The court said to R.W. that "I notice here you circled full-time student." Then the court explained that "[w]e've been letting students off," because they might get so far behind academically that they could not catch up, and "[t]hat's my concern." The court continued: "And we've let a lot of students off here now. If you think you can do it both ways, that's okay. But if you think it's going to be a burden, you know, to go to school full time, taking 17 units and maybe sitting here as a juror for a month, two months, you let me know now. Because if it's going to be a real problem, I will seriously consider letting you go. [¶] What do you think?"

The following exchange then occurred: "Prospective Juror Mr. [W.]: This is during the month of December? [¶] The Court: December and probably January. [¶] And that's around finals time; right? [¶] Prospective Juror Mr. [W.]: Yeah. [¶] The Court: See, that's the problem. [¶] Prospective Juror Mr. [W.]: Most likely it would probably be a burden. [¶] The Court: I think it will. Yeah. [¶] All right. [Defense counsel], over your objection I'm going to excuse Mr. [W.] I don't see any point in having this kid lose two months of school sitting here. [¶] I know you like him as a juror, but on the other hand, he should be treated like everybody else. He is a full-time student. Seventeen units is a big load to carry. And to sit here for two months I think would unduly burden him, and he admitted as much just now."

Defense counsel argued that R.W. had not brought up the subject himself, had inquired about scheduling, and had "admitted" hardship only after great hesitation. The court responded, "I'm not here to have kids flunk out of school by taking two months sitting here as a juror when we have a lot of

other jurors. I know he is 19 years old, he is an African-American. You probably want to see him as a juror. I understand that. [¶] But I don't want [R.W.] to blow a whole semester at school because of this case. He can always serve during the summer when he is not in school." Under these circumstances, the court asserted, "Why should he blow two months of school? It doesn't make any sense. It really doesn't." The court thereupon excused R.W.

■ "[A] trial court has authority to excuse a person from jury service for undue personal hardship. [Citations.] Exercise of that authority is reviewed for abuse of discretion. [Citation.]" (*People v. Mickey* (1991) 54 Cal.3d 612, 665 [286 Cal.Rptr. 801, 818 P.2d 84]; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 986, fn. 15 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Lucas* (1995) 12 Cal.4th 415, 488 [48 Cal.Rptr.2d 525, 907 P.2d 373].)[16] Under the governing statute, Code of Civil Procedure section 204, subdivision (b), such excusals "are to be granted only on a sufficient showing that the individual circumstances of the prospective juror make it unreasonably difficult for the person to serve or that hardship to the public will occur if the person must serve in the particular case." (*Visciotti*, *supra*, 2 Cal.4th 1, 44, fn. 15.)[17]

Here it is manifest, and defendant does not dispute, that the court applied a blanket policy of granting hardship excusals to prospective jurors who established to the court's satisfaction they were full-time students with academic schedules that would make jury service burdensome. The court made clear it believed such persons would suffer undue hardship and academic loss if forced to sit, during a critical period of their fall school terms, on a capital trial that might take two months to complete. Defendant fails to demonstrate that this determination was unreasonable.

Nor did the court act unreasonably by concluding, in each student hardship case, that the requisite showing of full-time student status had been made. L.S. and R.W. each were excused after they stated under oath, in their questionnaires and/or in oral voir dire, that they were taking 17 units of

---

[16] We have rejected claims that improper excusals of prospective jurors, including improper hardship excusals, denied defendants their constitutional rights to fair, impartial, and representative juries where the defendants failed to show that the excusals resulted in the seating of biased jurors (see *People v. Thompson* (1990) 50 Cal.3d 134, 158 [266 Cal.Rptr. 309, 785 P.2d 857]), or that a panel from which persons were excused for hardship reasons is less representative (see *People v. Visciotti* (1992) 2 Cal.4th 1, 44, fn. 15 [5 Cal.Rptr.2d 495, 825 P.2d 388] (*Visciotti*)). Defendant makes no such showing here.

[17] Code of Civil Procedure section 204, adopted in 1988 (Stats. 1988, ch. 1245, § 2, pp. 4140, 4144–4145), provides in subdivision (b) that "[a]n eligible person may be excused from jury service only for undue hardship, upon themselves or upon the public, as defined by the Judicial Council."

college credit at Cal State Hayward. A.K. was excused when he provided the court with official verification of his full-time student status at the University of California, Berkeley.

Nonetheless, defendant argues that the court excused R.W. improperly because (1) R.W. did not affirmatively claim a hardship exemption, but was coached and prompted by the court—acting in a misguided sense of paternalism toward a minority prospective juror—to say that jury service would burden him, and (2) the record does not establish that jury service would actually present an unduly burdensome conflict with R.W.'s class schedule and academic responsibilities.

At the outset, we observe that the record indicates no clear-cut *affirmative* request for excusal in either of the other cases in which student hardship excusals were granted. L.S. did say in her questionnaire that she could not afford to miss prepaid classes, but she did not explicitly ask to be excused for that reason. While A.K. brought in documentary support for his claim of student status, his questionnaire contained no assertion that jury duty would interfere with this status, and the record includes no other indication that he requested excusal.

Moreover, as a matter of reasonable discretion, we see no impropriety in the court's effort to protect the interests of one who reported his status as a full-time student, but did not immediately seek excusal on that basis. Whether R.W.'s inaction in this respect stemmed from initial ignorance that a hardship excusal might be available, or from a willingness to consider serving if service was practicable, the law did not require he be penalized, once he was before the court, for failing to demand excusal in the first instance.

Defendant points to California Rules of Court, rule 2.1008 (rule 2.1008), formerly rule 860, adopted under authority of Code of Civil Procedure section 204, subdivision (b). Rule 2.1008(b) "govern[s] the granting of excuses from jury service *by the jury commissioner* on grounds of undue hardship . . . ." (Italics added.) The rule specifies, among other things, that "[n]o class or category of persons may be automatically excluded from jury duty except as provided by law" (*id.,* subd. (b)(1)) and that "[a] statutory exemption from jury service [(i.e., for undue hardship)] must be granted only when the eligible person claims it" (*id.,* subd. (b)(2)). Defendant also cites Code of Civil Procedure section 218, which provides that "[t]he *jury commissioner* shall hear the excuses of jurors summoned, in accordance with the standards prescribed by the Judicial Council. . . . All excuses shall be in writing setting forth the basis of the request and shall be signed by the juror." (Italics added.)

But these provisions, which apply explicitly to the *jury commissioner's* preliminary screening of hardship claims received in response to a general

jury summons, have little or nothing to do with the procedures the *trial court itself* may subsequently employ to resolve hardship issues in the course of jury selection in a specific case. Defendant cites no authority suggesting that the statutes and rule he invokes limit the *trial court's* authority, upon its reasonable exercise of discretion, to examine and excuse individual prospective jurors on grounds of undue hardship.

Finally, we see no basis to conclude the record demonstrates insufficient justification to excuse R.W. As noted, full-time students L.S. and A.K. had previously been excused without objection, and with little inquiry into their specific academic burdens. There appeared no reason to treat R.W. differently. He was carrying a full load of 17 units and, upon inquiry by the trial court, he conceded that service in a lengthy capital case, under the trial schedule proposed by the court, during the "finals time" months of December and January, would "likely" be a burden. Accordingly, we find no error in the excusal of this prospective juror.[18]

### 3. *Excusal of prospective jurors for cause.*

Defendant urges that several prospective jurors were improperly excused on prosecution challenges as a result of the death qualification process. We find no merit in defendant's contentions.

The following principles apply: A prospective juror in a capital case may be excused for cause on the basis of his or her death penalty views if, but only if, those views would prevent or substantially impair the performance of a juror's duties under the court's instructions and the juror's oath. (*Witt, supra,* 469 U.S. 412, 424; *People v. Stewart* (2004) 33 Cal.4th 425, 441 & fn. 3 [15 Cal.Rptr.3d 656, 93 P.3d 271] (*Stewart*); *People v. Heard* (2003) 31 Cal.4th 946, 958 [4 Cal.Rptr.3d 131, 75 P.3d 53] (*Heard*); *People v.*

---

[18] The People read defendant's opening brief as arguing that R.W.'s excusal was improper because, among other things, rule 2.1008 does not include full-time student status as one of the enumerated grounds for hardship excusal. According to the People, defendant forfeited that particular claim because his counsel did not raise it below. Defendant responds he has never contended the court could not excuse for student status; rather, he asserts, he urges only that a student excusal should be judged under the most closely analogous ground set forth in rule 2.1008, that of "*extreme* financial burden." (Rule 2.1008(d)(3), italics added.) He claims his counsel preserved an argument that student hardship must similarly be "extreme" by objecting that R.W. did not request an excusal and that the court should have determined whether jury service would actually interfere with R.W.'s academic schedule. Assuming this latter contention was preserved (see *People v. Champion* (1995) 9 Cal.4th 879, 908, fn. 6 [39 Cal.Rptr.2d 547, 891 P.2d 93] (*Champion*)), it does not affect our conclusions here. As noted, rule 2.1008's strictures on the jury commissioner's authority to issue hardship excusals do not necessarily apply to hardship excusals granted by the trial court during voir dire; in any event, we are satisfied that the record supports the trial court's finding that service by full-time students in this particular case would have constituted a significant, undue burden.

*Cunningham* (2001) 25 Cal.4th 926, 975 [108 Cal.Rptr.2d 291, 25 P.3d 519].) Thus, a prospective juror may be excused if his or her views on capital punishment would cause him or her invariably to vote either for death, or for life, in the case at hand. (*People v. Ochoa* (2001) 26 Cal.4th 398, 431 [110 Cal.Rptr.2d 324, 28 P.3d 78] (*Ochoa*); *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248]; see *Morgan v. Illinois* (1992) 504 U.S. 719, 726–728 [119 L.Ed.2d 492, 112 S.Ct. 2222].)

We will uphold the trial court's decision to excuse a prospective juror under *Witt* if that decision is fairly supported by the record. (*Stewart, supra*, 33 Cal.4th 425, 441; *People v. Cunningham, supra*, 25 Cal.4th 926, 975.) The court must have "sufficient information . . . to permit a reliable determination" whether a prospective juror's views would disqualify the juror from service in a capital case. (*Stewart, supra*, at p. 445.) But even where the prospective juror has not expressed his or her views with absolute clarity, the court may be left with the definite impression that the person cannot impartially apply the law. Thus where, after reasonable examination, the prospective juror has given conflicting or ambiguous answers, and the trial court has had the opportunity to observe the juror's demeanor, we must accept as binding the court's determination of the juror's true state of mind. (E.g., *Uttecht v. Brown* (2007) 551 U.S. 1, 9–10 [167 L.Ed.2d 1014, 127 S.Ct. 2218]; *Morgan v. Illinois, supra*, 504 U.S. 719, 729; *Witt, supra*, 469 U.S. 412, 424–426; *People v. DePriest* (2007) 42 Cal.4th 1, 20–21 [63 Cal.Rptr.3d 896, 163 P.3d 896] (*DePriest*); *People v. Avila* (2006) 38 Cal.4th 491, 529 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Moon* (2005) 37 Cal.4th 1, 14, 16 [32 Cal.Rptr.3d 894, 117 P.3d 591] (*Moon*); *Stewart, supra*, at p. 451.)

The erroneous granting of the prosecution's *Witt* challenge against a prospective juror requires automatic reversal of the penalty verdict, even if the prosecutor had remaining peremptory challenges and could have excused the prospective juror. However, an error of this kind does not require reversal of the guilt phase verdict. (*Gray v. Mississippi* (1987) 481 U.S. 648, 663–666 [95 L.Ed.2d 622, 107 S.Ct. 2045]; *Stewart, supra*, 33 Cal.4th at pp. 454–455; *Heard, supra*, 31 Cal.4th 946, 966; *People v. Ashmus, supra*, 54 Cal.3d 932, 956–957, 962.)[19] Moreover, the improper excusal for cause of a prospective juror for reasons other than his or her views on the death penalty does not require reversal of either the guilt or penalty judgments unless the defendant can show that the improper excusal resulted in the seating of a biased juror,

---

[19] Thus, the high court has held that the exclusion, through death disqualification, of "guilt phase includables" from the guilt phase of a bifurcated capital trial does not violate the "fair cross-section" or "impartial jury" guarantees, and we have agreed under both state and federal law. (*Lockhart v. McCree* (1986) 476 U.S. 162, 173–184 [90 L.Ed.2d 137, 106 S.Ct. 1758]; *Stewart, supra*, 33 Cal.4th 425, 455; *People v. Ashmus, supra*, 54 Cal.3d 932, 956–957.) Defendant contends otherwise, but does not persuade us to reconsider these conclusions here.

or of a sworn jury that was not fair and impartial. (*People v. Holt* (1997) 15 Cal.4th 619, 656 [63 Cal.Rptr.2d 782, 937 P.2d 213] (*Holt*).)

We consider each of the asserted improper excusals under these standards.

### a. *Prospective Juror A.S.-P.*

On her juror questionnaire, A.S.-P., who identified herself as African-American, indicated she had done graduate work in international and multi-cultural education at the University of San Francisco (USF), and had received a Doctor of Education degree in 1992.

On October 6, 1992, court and counsel conducted the sequestered voir dire of A.S.-P. In response to questioning during the death qualification procedure, she stated that she had no feelings about the death penalty that might prevent her from selecting the appropriate penalty in a capital case, and that after hearing all the relevant evidence, she could choose between life and death. She indicated she had reservations concerning the time lapse between the commission of a crime, conviction, and execution, and also about the method of execution. However, she asserted, she accepted these circumstances as part of the process, and they would neither affect her ability to apply the law nor influence her penalty decision.

In her general voir dire, which followed immediately, A.S.-P. stated that, while she thought it was "impossible" to be completely free of bias, she believed she could put any bias aside and be "objective." Defense counsel asked A.S.-P. about her experience as the victim of a burglary, and about an assault on her niece by the niece's domestic partner. A.S.-P. again indicated that, despite these events, she could be objective in the instant case.

Neither party challenged A.S.-P. for cause at the conclusion of her voir dire. The court advised her she had qualified herself to sit on a capital jury, and it directed her to return at a subsequent time for peremptory challenges.

On October 27, 1992, while the voir dire process was still ongoing, the prosecutor challenged A.S.-P. for cause. Asked by defense counsel to explain the belated challenge, the prosecutor said that A.S.-P. had claimed she had a doctoral degree in her juror questionnaire, and had asked the court bailiff to call her "doctor," but the prosecutor had had a "funny feeling about that," so he checked with USF and discovered that A.S.-P. "has lied to us" and "is not a doctor in education." The prosecutor stated he had spoken by telephone to Sunny Kidd, an administrative aide at USF who, after looking at A.S.-P.'s file, reported that A.S.-P. was currently in USF's doctoral program, but "has not submitted her dissertation yet" and had not been awarded a doctoral degree.

When defense counsel inquired whether "the basis for the challenge for cause is perjury," the prosecutor confirmed that "[i]t's perjury." However, the court indicated it was not a question of perjury; rather, the court remarked, "It's a question of [A.S.-P.'s] credibility in how she answered her other questions. If she purports to be something she isn't, how can we lend any credence to the way she answered her other questions?" The court briefly took the matter under submission to allow defense counsel to obtain a copy of A.S.-P.'s questionnaire.

When the court took up the matter again later the same day, defense counsel asserted that the prosecutor had singled out A.S.-P., "an African-American woman with a high education," for investigation, and that the Penal Code did not allow a challenge under these circumstances. In any event, counsel urged, A.S.-P. should be called back to explain her questionnaire answers, because she might have misinterpreted the question about her academic credentials, and because hearsay information the prosecutor had obtained on the telephone should not be a sufficient basis for challenge.

The court responded that it believed "the Penal Code allows the Court to take into consideration the veracity of the particular juror if the Court's of the opinion that there may be some question about the credibility of that particular juror and it's brought into question. I think the Court has a right to—to weigh and assess that credibility, number one." Moreover, the court stated that it seemed unlikely A.S.-P. was confused, and that there appeared no reason to disbelieve the prosecutor, an officer of the court.

Counsel insisted she did not disbelieve the prosecutor, but was concerned that the person he spoke to at USF—a person who, unlike A.S.-P., was not under oath—might have made a mistake. In response, the prosecutor provided further information about his inquiries at USF.

The prosecutor stated the following: He wanted to read A.S-P.'s dissertation before deciding whether to retain her as a juror. For that purpose, sometime before October 20, 1992, he called the USF library and spoke to librarian Vickie Rosen, who said the dissertation was not on file and not catalogued. He asked Rosen to look for the dissertation, and she spent several days doing so. On October 20, Rosen called him back and said "there is, in fact, no dissertation presented by [A.S.-P.]" He asked Rosen if this meant A.S.-P. had no doctorate in education. Rosen said she assumed so, but she advised him to call the administrative office for confirmation. The following day, he telephoned USF's postgraduate division and spoke to Kidd, an administrative assistant. After "pull[ing] [A.S.-P.'s] file," Kidd reported that "no, there is no dissertation on file . . . , [A.S.-P.] has not finished her dissertation, and she has not received a doctorate degree." The prosecutor

purposely refrained from speaking to A.S.-P.'s department chair, or asking USF for a confirmatory letter, because he was afraid such matters would "go into [A.S.-P.'s] file" and would actually compromise her efforts to achieve her doctorate.

The prosecutor argued that the willfulness of A.S.-P.'s misrepresentation was shown by the fact that she had insisted the court bailiff introduce her as "doctor." Moreover, the prosecutor observed, the court had addressed A.S.-P. by that title some 26 times during voir dire without being corrected by her. The prosecutor also indicated he had called USF on the very day he heard commentator Charles Osgood speak on the radio about people who misrepresent their degrees and awards to obtain employment.

Defense counsel seemed to concede the possibility that, for whatever reason, A.S.-P. had "padded her resumé," perhaps to maintain "a certain consistency" after exaggerating her credentials on an employment application, as Charles Osgood had suggested people do. Counsel nonetheless pressed her contention that A.S.-P. should be allowed to appear personally and provide any information that might rebut or explain such concerns. The court refused, suggesting again that A.S.-P. was an educated person, could not have been confused, and had had numerous opportunities to advise the court she did not have a doctorate.

"[T]he problem with what's happened here," said the court, "is she's been caught misrepresenting her credentials pure and simple. . . . [¶] She's telling us that she is something she isn't. This casts some question on her veracity in my mind. How can you believe her answers to her other questions? She is playing games with the Court."

The court asserted that the prosecutor had presented "pretty good, solid evidence," and that the court would accept his representation. The court declared that "[t]here is no question in my mind, based upon the representations from [USF], from the people who are running the program, that [A.S.-P.] doesn't have a Ph.D. degree or doctor of education." Moreover, the court suggested, it did not wish to subject A.S.-P. to the "embarrassment" of coming to court and being "called on the fact that she misrepresented her credentials."

Alluding to defense counsel's speculation that A.S.-P. might have over-stated her credentials on a job application, the court asked, "Wouldn't that be more grounds to question her credibility and question her character if you're telling me she's padded her credentials in order to gain employment?" The court continued, "She has not been forthright with us in telling us what her credentials are. Maybe that's one little white lie, and how many others are

there in that particular questionnaire. Now she's been caught in perpetrating—I'm not going to say a fraud, but a misconception on this Court and on everybody in this courtroom. [¶] How can you trust the rest of her answers? How do I know?"

Stating again its view that the error could not have been inadvertent, and that the misrepresentation raised questions about the veracity of all A.S.-P.'s voir dire answers, the court granted the challenge for cause. The court made clear that it was taking this action because, "based upon her representation and her answers, the Court has some question about the veracity of the rest of her answers, because apparently she has not been forthcoming with the Court in answering these questions truthfully."

The next day, the court placed on the record that the excusal of A.S.-P. was "based on Wainwright versus Witt, because the impression is that it's under [Code of Civil Procedure section] 229, and that's not correct."[20] When defense counsel objected that A.S.-P.'s voir dire answers had made her a death-qualified juror, the court reiterated that "[i]t's a Wainwright versus Witt challenge. That is the basis for the challenge as far as I'm concerned."

On appeal, defendant insists the record was inadequate to justify a *Witt* excusal. He asserts that all A.S.-P.'s questionnaire and voir dire answers concerning her death penalty views indicated that they would not prevent or substantially impair her ability to serve as a capital juror. Indeed, the People do not suggest otherwise.

This being so, defendant contends, the court, faced with claims that A.S.-P. had misrepresented or concealed material information on voir dire tending to show disqualifying bias regarding the death penalty, was obliged to make a sufficient inquiry to determine the truth of such allegations. At a minimum, he asserts, this required the court to recall A.S.-P. herself, and to hear her explanation, before concluding that she had committed misconduct warranting excusal under *Witt*.

Finally, defendant insists, the excusal of A.S.-P. under *Witt* was error, requiring at least a penalty reversal, even if there was a proper showing that she lied on her questionnaire about holding a doctoral degree. Any such falsehood, defendant urges, bore no reasonable relationship to a conclusion that her death penalty views would prevent or substantially impair her ability to judge the issue of capital punishment fairly.

However, we need not determine whether A.S.-P.'s excusal would have been proper under *Witt*. This is because we are persuaded that, despite the

---

[20] Code of Civil Procedure section 229 states the grounds for a prospective juror's excusal for bias, actual or implied.

trial court's single contrary statement, the prosecutor *did not* challenge A.S.-P. on the basis of *capital penalty bias*, and the excusal of this prospective juror cannot properly be characterized as premised on such a ground. Our reasons for this conclusion are several.

First, neither A.S.-P.'s questionnaire, nor her voir dire, was confined to examination of her death penalty attitudes. The juror questionnaire asked about views on the death penalty, but it also broadly explored how the prospective juror's background might relate to general bias for or against a party. Similarly, as indicated above, the voir dire of each prospective juror began with death qualification but, if no *Witt* challenge was interposed and granted at this stage, the examination then immediately proceeded to noncapital issues. So it was with A.S.-P. Indeed, as noted above, A.S.-P. stated on her questionnaire, and confirmed during general voir dire, that she had been the victim of a burglary, and that her niece had suffered an assault. In response to voir dire questions, A.S.-P. stated that whatever biases she might have as the result of these life experiences, she believed she could set them aside and be objective in the case at hand.

Second, contrary to the court's statement that *Witt* was the "basis for the challenge" against A.S.-P., the prosecutor *did not* challenge this prospective juror on grounds that her death penalty views disqualified her for service on a capital jury. Instead, the prosecutor twice specified that his challenge was based on a claim of perjury.

Third, in all but one instance, the court itself made clear that it was not concerned, in particular, with A.S.-P.'s death penalty attitudes as a basis for her qualifications to serve in a capital case. While the court strove to avoid the prosecutor's term "perjury," the court agreed—indeed, stressed time and time again—that the "problem" was A.S.-P.'s credibility in answering all the questions posed to her. As the court repeatedly stated, if A.S.-P. had lied in answering the question about her academic background, one could not be confident she had not also done so in the rest of her answers. The court went so far as to suggest that the apparent falsehood called A.S.-P.'s overall character into question.

Never once, when analyzing the prosecutor's challenge and the defense objections thereto, did the court indicate it believed the apparent falsehood impacted upon A.S.-P.'s capital qualifications in particular. Nor did the court do so in the course of issuing its ruling in the matter. The clear gravamen of the court's remarks was that, insofar as A.S.-P. had deliberately misstated her academic credentials, the court could not trust any of her claims that she would be a fair and impartial juror.

Finally, for the reasons stated above, we are not convinced by the post hoc rationale the court placed on the record the day after it excused A.S.-P. Read as a whole, the record makes it apparent the court was not focused on A.S.-P.'s death penalty attitudes, but rather on whether she had represented herself honestly as a basis for allowing the court, and the parties, to assess her general qualifications for jury service.

■ The court's concerns about A.S.-P.'s overall credibility were, of course, relevant to those qualifications. A prospective juror's misstatement or concealment on voir dire of a material fact by itself undermines the selection and empanelment of unbiased jurors, and thus the Sixth Amendment right to an impartial jury, and constitutes misconduct. (*In re Hitchings* (1993) 6 Cal.4th 97, 110–112 [24 Cal.Rptr.2d 74, 860 P.2d 466].)

■ We do think the trial court would have been well advised to re-call A.S.-P. and hear her explanation before excusing her on grounds she had misstated her academic credentials. However, we need not decide whether the trial court erred in granting the prosecution's challenge for cause on this ground, either because the court conducted an inadequate factual inquiry, or because the apparent misstatement of academic credentials was an insufficient basis for excusal. We have rejected "[the] assumption that an error in excusing a juror for reasons unrelated to the [juror's] views on imposition of the death penalty requires reversal. '[T]he general rule [is] that an erroneous exclusion of a juror for cause provides no basis for overturning a judgment.' [Citation.]" (*Holt, supra*, 15 Cal.4th 619, 656.) Even if defendant "was denied a juror with scruples against the death penalty who could not have been disqualified on *Witherspoon-Witt* grounds, . . . [A.S.-P.] was not excluded on those grounds. Defendant has a right to jurors who are qualified and competent, not to any particular juror. [Citation.] He does not assert that, as a result of the excusal of [A.S.-P.], a juror was seated who did not meet those criteria or that, as a result of her excusal, he was tried before a jury that was not fair and impartial." (*Holt, supra*, at p. 656.) Accordingly, the court's excusal for cause of A.S.-P. affords no basis for disturbing the guilt or penalty judgments.[21]

---

[21] We do not, of course, endorse or affirm the trial court's determination that A.S.-P. misrepresented her credentials. In fact, we are independently aware of contrary evidence. In 2003, another condemned prisoner, seeking to demonstrate on habeas corpus that the same prosecutor falsely claimed similar misrepresentations by a prospective juror in his case, submitted to this court copies of documents indicating that in May 1992, USF awarded A.S.-P. a doctorate in education. (See *In re Young*, petn. for writ of habeas corpus filed Apr. 23, 2003; order to show cause issued regarding one claim, and all other claims dismissed, Oct. 11, 2006, S115318.)

We have denied defendant's request to take *judicial notice* of these records for purposes of the instant appeal. They are not part of the appellate record and were not before the trial court when it excused A.S.-P. We have consistently rejected efforts to augment an appellate record

### b. *Prospective Juror B.E.*

On her juror questionnaire, B.E. answered "no" to questions whether she had feelings about the death penalty, and whether any religious or philosophical principle would affect her ability to vote for the death penalty in the instant case. She wrote that life without parole was a "just punishment for very severe crimes," and indicated that if the death penalty were on the ballot, she would vote for it.

During oral voir dire, in response to more specific questions, she expressed far more uncertainty and ambivalence. Early in the examination, she twice flatly stated that she could never vote to execute another human being. She also declared, when first confronted with the issue, that the death penalty "would not be open to" her in a case where the defendant committed a first degree murder by stabbing the female victim to death during a residential robbery and burglary. At a later point, she confirmed that she could not, as the jury foreperson, sign a death verdict.

In other portions of her examination, B.E. appeared, albeit reluctantly, to soften and retreat from some of the absolute positions she had originally expressed. She acknowledged the death penalty was justified for "heinous" crimes, such as serial or child murders, and insisted she had no "hard and fast reservations" that would prevent her from voting to impose that penalty "under certain circumstances" if the crime involved was bad enough. When pressed by the court, and later by the prosecutor, B.E. protested that it was difficult to say what she could do in this case without knowing more about the facts. However, she indicated that, while inclined to life without parole on the facts she did know, she could consider both penalties. She explained that her initial flat refusal to consider the death penalty stemmed from a "reservation" about whether she was "strong enough within herself" and "had a strong enough sense of herself with respect to this particular issue" to undertake "one of the heaviest decisions I would ever have to make in my life." On reflection, she said, she thought she had enough strength to make the "right" and "proper" decision on the facts.

Defense counsel then sought to ascertain whether there was a distinction between B.E.'s "philosophical" ability to envision the death penalty in this case, and her personal ability actually to impose it. At length, counsel candidly asked if, despite her philosophical views, "[y]ou're saying that

---

with matters not before the trial court. (*People v. Castillo* (2010) 49 Cal.4th 145, 157 [109 Cal.Rptr.3d 346, 230 P.3d 1132] [judicial notice]; see *People v. Peevy* (1998) 17 Cal.4th 1184, 1207 [73 Cal.Rptr.2d 865, 953 P.2d 1212]; *People v. Jones* (1997) 15 Cal.4th 119, 171, fn. 17 [61 Cal.Rptr.2d 386, 931 P.2d 960]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 585–586 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

personally you're not sure that you could impose the death penalty . . . ?" B.E. responded, "That's probably—that's probably what I am saying. Based on . . . my understanding of the crime, that's the only way I know how to express it."

Pursuing this issue, the court said to B.E. that, philosophy aside, "The question is when you get right down to it, is it something that you could do. That's all I want to know." B.E. answered, "I think I could. I think I could." The court suggested to B.E. that her answers were inconsistent, at which point she protested, "But had I not said that I can?" At this point, the court cut off questioning and excused B.E. In doing so, it noted that it had "observed [B.E.'s] demeanor, . . . listened to her answers, her long pauses, her vacillation."

This record amply supports the trial court's decision to excuse B.E. Though her answers were inconsistent and conflicting, they indicated that, even if she accepted capital punishment in the abstract for "heinous" crimes, she harbored very serious doubts whether, if seated on a capital jury, she could ever personally vote to impose the death penalty. " 'Those answers, in combination with the trial court's firsthand observations, could give rise to a definite impression that [B.E.'s] views on the death penalty would substantially impair the performance of [her] duties.' [Citation.] We thus defer to the court's ruling sustaining the prosecution's challenge[] for cause." (*DePriest, supra*, 42 Cal.4th 1, 22, quoting *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007 [47 Cal.Rptr.3d 467, 140 P.3d 775].)[22]

---

[22] Defendant contends B.E.'s answers suggested, at most, that she would have extreme difficulty in imposing the death penalty. Mere difficulty in this regard, he asserts, is not alone sufficient to justify a *Witt* excusal. However, defendant's citation to *Stewart, supra,* 33 Cal.4th 425 for this premise is inapposite. There we confirmed that, when the court chooses to rely solely on a prospective juror's written questionnaire answers to justify his or her excusal, the answers themselves must clearly indicate the juror's unwillingness or inability to determine the appropriate penalty under the instructions. We indicated that a brief written response to a question whether the juror's death penalty views would " 'prevent or make it very difficult' " to do so would not suffice. (*Id.* at pp. 446–447 & fn. 12.) Here, however, the court and both counsel subjected B.E. to substantial oral examination, and the court was able to observe the prospective juror during this process. Under such circumstances, a juror's conflicting or ambiguous answers may indeed give rise to the court's definite impression about the juror's qualifications, and its decision to excuse the juror deserves deference on appeal.

Contrary to defendant's contention, B.E.'s dismissal is distinguishable from that considered in *Heard, supra,* 31 Cal.4th 946, where we found no substantial support for the court's decision to excuse a prospective juror. There, the most the juror conceded was that there "might" be " 'past psychological factors' " in a capital defendant's background that " 'would weigh heavily enough that you probably wouldn't impose the death penalty.' " (*Id.* at p. 961.) Of course, a capital juror should be open to consideration of the defendant's mental issues as a mitigating penalty factor.

Defendant urges the court could not rely on B.E.'s statement she would not sign a death verdict as jury foreperson. (See *People v. Chacon* (1968) 69 Cal.2d 765, 772 [73 Cal.Rptr. 10, 447 P.2d 106].) However, there is no indication the court placed sole reliance on this statement.

### c. *Prospective Juror A.D.*

On his juror questionnaire, A.D., a 68-year-old African-American, did not answer questions about his views on the death penalty, and said he would need more information about a case before expressing any view on life without parole. He marked "not sure" when asked how he would vote on a ballot measure to adopt the death penalty.

On voir dire, when first asked whether he personally could ever vote to execute a person, A.D. said he "would have to look deep inside of me to really see whether that would be possible." A.D. said he was reminded that the justice system had dealt too slowly and leniently with the man who killed his daughter in a car accident, and he "[did not] know" if he could be "impartial" in listening to witnesses. But when asked if the experience in his daughter's case predisposed him to the death penalty, he responded, "No, no, no, no. I'd probably be inclined to vote for life without parole." A.D. said he was thinking of his own 35-year-old son, who was very quiet, but who might do something he regretted if cornered with no means of retreat. When asked if he thought these feelings would affect his ability to choose between the two penalties, A.D. answered, "Well, at the moment, yes."

At this point, the court said, "I think we have a <u>Wainwright versus Witt</u>," and the prosecutor responded, "Clearly." However, defense counsel was allowed to pursue the matter further. When counsel suggested that "what I think I hear you saying" is that "you wonder whether or not you could ever vote for the death penalty," A.D. agreed. When counsel asked if it was *possible* the facts could convince A.D. to agree to that penalty, A.D. answered that "[i]f I said yes to that right now, I feel like I would be committing myself" without first hearing the evidence. When counsel suggested that, even if A.D.'s son would have "some impact," A.D. would consider both penalties and make a decision based on the facts, A.D. merely responded, "The instructions of the judge, I will have to consider both penalties." The

---

Defendant complains that any disqualifying answers given by B.E. were the result of (1) awkward and legally inaccurate questions by the court, (2) the court's decision to cut off voir dire too soon, and (3) the court's undue restriction on voir dire inquiry about prospective jurors' attitudes toward the factual details of the case. We find no basis in the record for the first two of these claims, and we have already rejected defendant's contention that the court allowed too little voir dire about the facts of the case.

Nor is there merit to defendant's contention that, in evaluating the propriety of the trial court's decision to excuse, we should place heaviest weight on what was said late in the prospective juror's examination. Defendant cites no case, and we have found none, in which we overturned the trial court's grant of a prosecution challenge for cause under *Witt* on grounds that the prospective juror's later voir dire answers favored the juror's retention, even if the earlier ones did not. The trial court is entitled to consider the entirety of a prospective juror's examination in deciding whether a *Witt* excusal is justified.

court thereupon granted the prosecutor's challenge for cause, noting, over defense counsel's objection, that A.D.'s demeanor supported the decision.

Though defendant earnestly argues otherwise, the court's decision is amply supported. In several different ways, during questioning by both court and counsel, A.D. expressed serious doubts that he had the ability ever to impose the death penalty, or that it was possible the facts could persuade him otherwise. That he finally agreed he would "have to" follow the court's instructions if sworn as a juror does not indicate he believed he was actually able to do so. The court did not err in excusing this juror.

### d. *Prospective Juror P.M.*

In his juror questionnaire, P.M., a corporate mathematician, stated he had no "significant" death penalty views "at the moment," though imposition of this penalty was "[ob]viously" a "serious act," Moreover, over much of the course of an extended voir dire, he generally agreed that without "enthusias[m]," "with reluctance," "very conservatively," and "very cautio[usl]y," he could, after hearing all the evidence, comply with California law, weigh the aggravating and mitigating factors, and decide whether the death penalty was appropriate, both generally and in a case where the defendant committed first degree murder by stabbing an African-American female victim to death in her home during a residential burglary and robbery. At one point, P.M. indicated he could sign a death verdict as jury foreperson.

On the other hand, he expressed the view that the death penalty should be reserved for "heinous" crimes. While a single-victim case was not necessarily excluded, he suggested, the facts should be "quite extreme" and present "more than the ordinary repulsion," something "not . . . ordinarily read in the newspaper." At various times, he indicated uncertainty about how the process worked, asking whether the existence of one or more aggravating factors was necessary for the death penalty, or compelled that penalty. He indicated his feelings were "ambivalent," saying he could "rethink it many times and never reach a permanent sort of conclusion." He mused uncomfortably about being obligated to "do[] what the law dictates," "comply with what society requires," and be a "pawn of society." "The whole thing," he lamented, "is a social almost dilemma." He expressed the strong understanding that "rehabilitation" was a prime objective of the penal system, and he seemed taken aback when the court advised that in a capital case, the defendant's potential for progress toward reentry into society was not a factor in the penalty decision.

P.M.'s feelings appeared to crystallize when, during examination by defense counsel, he realized that, at the penalty phase of a capital trial, the alternative to death was life without the possibility of parole, a sentence

under which the defendant would remain forever behind prison walls. At this point, P.M. stated, "It is perhaps the case that I'm wasting the court's time. There are matters upon which people cannot decide. This may be one of them. . . . [I]f there is the option of life in prison without the possibility of release, that is perhaps insurmountably the way to go." (Italics added.)

The court interrupted to ask whether P.M. was saying that if life without parole was available, the death penalty was not an option. P.M. answered, "I am saying I'm very confused," and he agreed he "sure would" have some difficulty in making this decision under those circumstances. At this point, the court denied defense counsel's request to ask further questions, and excused P.M.[23]

The record provides full support for the trial court's decision. P.M. had expressed reluctance and ambivalence about his ability to follow the death penalty law. However, he ultimately stated that if he could vote to keep defendant in prison for life, without any possibility of release, this alternative might be the "insurmountabl[e]" choice, and further efforts to determine his qualifications thus might be a "wast[e of] . . . time." P.M.'s brief expressions of "confus[ion]" and "difficult[y]" thereafter did not significantly detract from this, his strongest statement. The court could reasonably conclude that P.M.'s views would prevent or substantially impair his ability to consider the death penalty.

Defendant urges the trial court influenced P.M.'s "tipping point" by wrongly telling this prospective juror that defendant's rehabilitation—i.e., his redeemability as a person—was not at issue. The contention lacks merit. In the first place, defendant has forfeited the issue, since his counsel raised no objection at trial.

In any event, the court simply told P.M. that, while all the possibly sympathetic factors in defendant's background were relevant, "nobody here is talking about rehabilitating anybody. We are talking about penalties pure and simple, because he's never going to get out. There is no reason to prepare him to get back into society," no reason "to teach him a trade, to teach him to be a printer, unless he is going to be printing books in prison for the rest of his life." These remarks only highlighted, accurately, that this was not a case in which the penal system was obliged to try to prepare defendant for a return to society. The court's comments were permissible.

---

[23] Though defense counsel requested the opportunity for further questioning, she did not object specifically to the excusal itself. Because the question of whether this resulted in a forfeiture of the latter issue is close and difficult, we proceed on the assumption that no forfeiture occurred. (*Champion, supra*, 9 Cal.4th 879, 908, fn. 6.)

Defendant also argues the court erred by denying defense counsel's request for further questioning after P.M. stated he might "insurmountably" choose life without parole over death. (See *People v. Mattson* (1990) 50 Cal.3d 826, 845 [268 Cal.Rptr. 802, 789 P.2d 983] [counsel's right to attempt to rehabilitate potentially disqualified prospective juror].) Again, we disagree. After a lengthy voir dire, during which P.M. had acknowledged only the most reluctant willingness to consider the death penalty, he ultimately stated an "insurmountabl[e]" inclination to vote for life without parole over death. P.M. himself suggested that further inquiry "might be a wast[e] [of] the court's time." Rehabilitation seemed a remote possibility under those circumstances, and the court could reasonably conclude that further voir dire would not change its impression of P.M.'s state of mind. No error occurred.

e. *Prospective Juror M.R.*

In her juror questionnaire, M.R. stated she was against the death penalty and felt life without parole was "[b]etter than death." On voir dire, M.R. continued to indicate her opposition to the death penalty, but she displayed great confusion about whether she could vote to impose that penalty, either generally or in the instant case. She first misunderstood a question whether she could vote to "execute" someone as asking whether she could *convict* a guilty person. Once that issue was cleared up, she initially stated she could not vote to execute someone in the gas chamber, but then backpedaled, indicated she wasn't "really sure," and said she "guess[ed]" it depended "on what the person did." As an example, she mentioned Charles Manson.

When the court suggested her willingness to impose the death penalty in extreme cases meant she was not opposed to that penalty after all, she said, "I guess not." But then she changed course again; when the court asked her whether her questionnaire response meant she could not vote to send someone to the gas chamber, she said, "That's true." When the court asked her to explain her conflicting answers, she said, "Well, I don't know how to explain myself, but I just—My belief, I don't think—You know, I don't think anybody should be executed to death penalty."

Defense counsel finally got a fairly clear statement from M.R. that she could vote for death in certain deserving cases, such as Charles Manson's. Moreover, when counsel asked if M.R. could consider both penalties for someone who fatally stabbed a woman during a residential burglary and robbery, M.R. initially said, "Yes." But when counsel pressed the point by asking again whether "[b]oth penalties are something you would consider," M.R. said, "I would consider one of them." When the court asked which one, M.R. responded, "I would probably say the life." When counsel

yet again tried to clarify if M.R. would seriously consider the death penalty in a case like this one, M.R. said, "Not for—I guess not for burglary. I know it's burglary and—"

At this point, the court solicited a challenge from the prosecutor and, over a defense objection, excused M.R. As the court explained to defense counsel, "[T]his is a failure under Wainwright versus Witt. In looking at the potential juror, listening to her responses, I am satisfied that she's a Wainwright versus Witt failure."

Despite the confusion and inconsistency of her answers, M.R. made it reasonably clear that her scruples against the death penalty would probably render her unable to consider the death penalty in the case at hand. The court's impression in this regard was reinforced, as it said, by its observation of the juror.

Defendant suggests the excusal was motivated by the court's inexplicable refusal to understand how a juror could be conscientiously opposed to the death penalty, yet willing to impose that penalty in particular cases. The record does not support this inference. Rather, as indicated, it suggests the court acted on its impression that M.R. was hopelessly ambivalent about her death penalty stance and, in any event, was unable to consider both penalties in the instant case. No error occurred.

f. *Prospective Juror R.F.*

On her juror questionnaire, R.F. did not answer inquiries about her death penalty views, except to say she was "not sure" whether she would vote for a death penalty measure if one were on the ballot. In the course of a lengthy voir dire by court and counsel, R.F. vacillated among three basic positions: first, that she "honestly didn't know" whether she could vote to impose the death penalty; second, that she needed full information about the crime and the defendant's background to answer; and third, that she could choose between the two penalties under the process as explained to her.

However, R.F. alluded to deep personal reservations about her ability to make this decision, suggesting at one point that "[S]ubconsciously, I do not know whether I could be the one to say, yes, he deserves the death penalty." When the court asked what good society gets out of the death penalty, R.F. responded, "Nothing, really," while she indicated that life without parole requires "the person . . . to sit and think about what he has done." She indicated she thought life without parole was the worse penalty.

When the court asked if R.F., acting as jury foreperson, could sign a death verdict, she flatly said "no" and maintained that position, explaining that she

could not assume such a responsibility. When defense counsel then asked what was the difference between voting to impose the death penalty and signing a verdict form, R.F. responded, *"Put it that way, there is no difference."* (Italics added.) Over a defense objection, the court thereupon granted the prosecution's challenge for cause.

After R.F. had left the courtroom, an extended discussion ensued between court and counsel. The court explained that its ruling was based on *Witt*, and was supported by R.F.'s confusion, her inconsistent answers, and her demeanor. Defense counsel urged that further questioning should have been allowed, and that R.F.'s demeanor did not support the court's decision. The court responded that R.F. had had plenty of opportunity to make her position clear, that she had not done so, and that an attempt to rehabilitate her would have been futile.

At this point, the prosecutor pointed out that in response to defense counsel's last question, R.F. had agreed there was no difference between signing a death verdict—an act R.F. clearly stated she could not perform— and voting to impose the death penalty. The court responded, "Yeah. Anybody reviewing this record can read that for themselves. It's in black and white in the record. And I'll go to the bank with this ruling."

We agree. Despite her earlier struggles to formulate her death penalty views, R.F. achieved clarity when confronted with defense counsel's suggestion that it was illogical to be willing to vote to impose the death penalty, but unwilling to sign the death verdict. R.F.'s response could only be understood as her concession that she could do neither. The excusal was proper.

B. *Guilt phase issues.*

1. *Admission of defendant's statements in police custody.*

Defendant urges the trial court erred by declining to suppress his statements made in police custody, both to the investigating officers and to Lisa Henry. As discussed below, he insists his *Miranda* waivers were not knowing and intelligent waivers of his Fifth Amendment right against self-incrimination because (1) the officers prejudicially misled him about the scope of their interrogation, and (2) Henry was acting, without his knowledge, as a police agent. These contentions lack merit.

The following facts disclosed at the in limine suppression hearing (Evid. Code, § 402) are essentially undisputed: Following his arrest on April 19, 1988, defendant was brought to the Oakland Police Department's homicide division. There he was questioned by Sergeants Paniagua and Medsker. At the

outset of an initial, unrecorded, session, the officers stated they were investigating the car defendant had been driving, because the car was stolen and a lady had been "hurt," but they did not tell defendant the victim had been killed. They then read defendant his *Miranda* rights. Defendant waived those rights, both orally and in-writing, and agreed to talk.

At the beginning of a subsequent, recorded, session, defendant asked if he was in the homicide division. Paniagua replied that he was. Defendant said, "So I'm here for a car that was stolen." Paniagua explained again that he was investigating an incident in which a car was stolen and a lady was "hurt"; and he stated that "I'm not here to trick you into anything." Defendant said, "I know you ain't, just tell me, you just said a car was stolen." Paniagua repeated that he was investigating "the incident [in] which the car was taken." Defendant responded, "Whatever you said, okay." Paniagua asked if everything was now clear in defendant's head, and defendant answered, "Yeah." Paniagua then re-*Mirandized* defendant.

During these first two sessions, defendant denied all knowledge and involvement in the incident under investigation and maintained he obtained the vehicle from Fred Bush in payment for a debt. Prior to the third, unrecorded, portion of the interview, Paniagua advised defendant the victim in the stolen car incident was dead. Thereafter, during this third session, the officers confronted defendant with the facts that Fred Bush was in jail, that defendant's clothing was bloodstained, and that he had been arrested in possession of the victim's car, television, and VCR. They accused defendant of lying and urged him to tell the truth. He responded, "Why should I tell the truth? Well, what's in it for me? I'm going to jail anyway." Early in the morning of April 20, 1988, following this third session, the officers arrested defendant for Sarah LaChapelle's murder.

Later in the morning of April 20, the officers executed a search warrant at the home of Lisa Henry, then brought Lisa to the police station and obtained a statement from her. Defendant was in an adjacent interview room at the time. Lisa was allowed to speak with defendant, and, in a recorded interview, she reported her conversation to the officers.

The evidence at the suppression hearing was in dispute about who initiated Lisa's meeting with defendant. The officers indicated the following: They told Lisa they had been questioning defendant all night and he was not telling the truth. She asked to speak with him, suggesting that maybe she could get him to tell the truth. The officers agreed. They had not planned to have Lisa talk with defendant, they did not tell her to try to get information from him, they suggested no questions for her to ask, they said nothing about Fred Bush, and they did not consider her a police agent.

In her recorded statement concerning her conversation with defendant, Lisa stated, among other things, that defendant "said he didn't do it. He said Freddie, Fred did it." According to Lisa's statement, defendant also indicated that "he tried to stop Fred" and that the victim "was a lady."

At one point on the recording, Paniagua asked Lisa, "Did I tell you to do anything else?" Lisa responded, "No, *you asked me just did I want to talk to him*, maybe I can talk to him to convince him to tell the truth or to tell what happened." On the recording, Paniagua reacted by saying, "Okay. [¶] Is this a true statement?" Lisa responded, "Yes." At the hearing, Paniagua explained that Lisa's "you asked me" statement was not accurate, but it was not appropriate to argue about the matter at that time.

The trial court rejected defendant's argument that he was tricked into waiving his *Miranda* rights when the officers failed to tell him he was suspected of a homicide, but simply indicated they were investigating a car theft in which a lady got "hurt." The court noted, among other things, that defendant expressed awareness he was being questioned in the homicide division, and must have inferred a killing was involved. Contrary to the defense's contentions, the court also found that Lisa Henry had spoken to defendant on her own initiative, and thus was not a police agent. Even if she were, the court further concluded, there was no requirement defendant be *Mirandized* a third time before she spoke to him. Accordingly, the court denied the motion.

As below, defendant urges that he was deceived into waiving his *Miranda* rights when the officers failed to tell him they were investigating a homicide, instead substituting their misrepresentation that the lady who owned the stolen car had merely been "hurt." Hence, he argues, his waiver of his Fifth Amendment right against self-incrimination was not knowing, voluntary, and intelligent. We disagree.

At the outset, we agree with the trial court that the evidence indicates defendant was not ignorant, when he twice heard and waived his *Miranda* rights, about the nature of the officers' investigation. They told him they were investigating the stolen vehicle in which he had been arrested, and they indicated a lady had been "hurt" in the incident. Thus, he understood the matter was more serious than mere car theft. Nor, it appears, was he misled by any ambiguity in the officers' use of the word "hurt" rather than "killed." Recognizing that he was in the "homicide" division, he specifically asked the

officers if this was so, and they indicated it was. He must certainly have understood that the injury at issue was fatal.[24]

Even if this evidence were not present, however, we would not accept defendant's contention. We conclude the officers did nothing to invalidate defendant's two separate waivers of his *Miranda* rights.

■ As the high court explained in *Colorado v. Spring* (1987) 479 U.S. 564 [93 L.Ed.2d 954, 107 S.Ct. 851] (*Spring*), the Fifth Amendment simply provides that no person may be compelled to be a witness against himself or herself. (*Spring*, at p. 572.) But this right can be waived, if the waiver is knowing, voluntary, and intelligent. (*Ibid.*) The warnings required by *Miranda, supra*, 384 U.S. 436 for a suspect in custody—i.e., that the suspect has the right to refuse to talk, to talk only with counsel present, and to stop talking at any time, and that criminal prosecutorial use will be made of any statements the suspect does utter—are designed fully to protect the knowing, voluntary, and intelligent exercise of the constitutional right against compelled self-incrimination in that custodial context. (*Spring, supra*, at p. 572.) Thus, in general, a suspect in custody who, having heard and understood a full explanation of these rights, then makes an uncompelled and uncoerced decision to talk, has thereby knowingly, voluntarily, and intelligently waived them. (*Id.* at p. 574.)

"[A] valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might . . . affec[t] his decision to confess.' [Citation.] '[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.' [Citation.]" (*Spring, supra*, 479 U.S. 564, 576–577.)

■ In *Spring*, the defendant argued that, when confronting him in custody about a federal weapons charge, agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) tricked him into waiving his right to silence by failing to warn him they would also ask about a Colorado murder. Hence, he urged, his admissions to the ATF agents about this latter crime tainted his subsequent murder confession to Colorado authorities. The *Spring* court disagreed, holding that mere failure by law enforcement officers to advise a custodial suspect of all possible topics of interrogation is not trickery sufficient to vitiate the uncoerced waiver of one who heard and understood the warnings required by *Miranda*. (*Spring, supra*, 479 U.S. 564, 576.)

---

[24] Indeed, defendant's subsequent testimony under oath at trial established his knowledge, at the time of his arrest, that he was driving Sarah LaChapelle's vehicle, and that she was dead. Defendant testified at trial that, after seeing two men emerge from Sarah's home, he entered, found her body, and ultimately decided to take her car, television, and VCR.

Defendant points out that, in *Spring*, the United States Supreme Court left open whether, and under what circumstances, "affirmative misrepresentations" by the police about the scope of their investigation might vitiate a *Miranda* waiver. (*Spring, supra,* 479 U.S. 564, 576, fn. 8.) However, as examples of the "certain circumstances" under which the court had previously invalidated Fifth Amendment waivers procured by affirmative police misrepresentations, *Spring* cited cases involving falsehoods that were of a coercive nature, and thus reasonably calculated to induce false confessions. (*Ibid.*; see, e.g., *Lynumn v. Illinois* (1963) 372 U.S. 528 [9 L.Ed.2d 922, 83 S.Ct. 917] [misrepresentation by police officers that suspect would be deprived of state financial aid for her dependent child unless she cooperated]; *Spano v. New York* (1959) 360 U.S. 315 [3 L.Ed.2d 1265, 79 S.Ct. 1202] [misrepresentation by suspect's friend that friend would lose his job if suspect failed to cooperate].)

■ We have recently confirmed that "[t]he use of deceptive statements during an interrogation . . . does not invalidate a confession [as involuntary, unknowing, or unintelligent] unless the deception is ' " 'of a type reasonably likely to procure an untrue statement.' " ' (*People v. Jones* (1998) 17 Cal.4th 279, 299 [70 Cal.Rptr.2d 793, 949 P.2d 890]; see *People v. Thompson* (1990) 50 Cal.3d 134, 167 [266 Cal.Rptr. 309, 785 P.2d 857].)" (*People v. Carrington* (2009) 47 Cal.4th 145, 172 [97 Cal.Rptr.3d 117, 211 P.3d 617] (*Carrington*).)[25] Defendant urges that by deceptively minimizing the seriousness of the investigation, the officers induced false statements that were later used against him, but his argument fails to persuade.

At all times before he was informed the victim in the car theft incident under investigation was dead, defendant denied all criminal involvement in the incident. The most damaging thing he did during his interrogation by the officers was to state falsely that he had obtained the car from Fred Bush in payment for a debt. To be sure, this lie was later exposed and used against him to show a consciousness of guilt. But it is difficult to see how the Fred Bush falsehood was *induced because* the police at first told him the victim was "hurt," as opposed to advising him she had died. In either case, his motivation to make *false exculpatory statements* was the same; he sought to avoid criminal responsibility for the crimes under investigation. If anything, the motivation to lie to escape responsibility would have been even greater had he been advised he was a murder suspect. We therefore reject defendant's contention that the officers' statements the victim had been "hurt" as opposed

---

[25] This case does not involve ploys or deceptions that amount to the forbidden interrogation of a suspect who then has an unwaived Fifth or Sixth Amendment right to be free of police questioning. (See, e.g., *Rhode Island v. Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682]; *Brewer v. Williams* (1977) 430 U.S. 387 [51 L.Ed.2d 424, 97 S.Ct. 1232].)

to killed invalidated his *Miranda* waiver or rendered his statements involuntary, unknowing, or unintelligent.

We also find no merit in defendant's contention that his statements to Lisa Henry at the police station were inadmissible because, without providing *Miranda* warnings for a third time, the police used her as an agent to obtain incriminating information. The trial court ruled against this argument on two correct grounds.

■ First, "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." (*Illinois v. Perkins* (1990) 496 U.S. 292, 296· [110 L.Ed.2d 243, 110 S.Ct. 2394] (*Perkins*); accord, *People v. Mayfield* (1997) 14 Cal.4th 668, 758 [60 Cal.Rptr.2d 1, 928 P.2d 485] (*Mayfield*).) As the high court explained in *Perkins*, *Miranda* protects the Fifth Amendment rights of a suspect faced with the coercive *combination* of custodial status *and* an interrogation *the suspect understands as official*. On the other hand, even if a suspect happens to be in custody, "[t]here is no empirical basis for the assumption that [when] speaking to those whom he assumes are not officers, [he] will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." (*Perkins, supra*, at pp. 296–297.)[26]

Defendant stresses a factual distinction between this case and *Perkins, supra*, 496 U.S. 292. There, suspecting the defendant of a crime unrelated to the offense for which he was then incarcerated, the police planted an undercover agent in his cellblock to befriend him and elicit incriminating information about the unrelated crime. By contrast, defendant urges, he was "in the throes" of a custodial *interrogation* about the Sarah LaChapelle case at the time Lisa spoke to him about that same incident. Thus, defendant suggests, he, unlike the defendant in *Perkins*, confronted the coercive combination of circumstances that brings *Miranda* into play.

■ We disagree. We held in *Mayfield* that the police did not violate *Miranda* when, after the defendant in custody *had invoked* his right to silence, and thus could not be further interrogated, they allowed his father to discuss the case privately with him, then extracted a report of what was said. We so concluded because " 'defendant's conversations with his own visitors are not the constitutional equivalent of [forbidden] police interrogation.'

---

[26] We are not concerned here with the rule banning the use of police agents to obtain information from defendants about crimes with which they have been formally charged, and as to which their *Sixth Amendment* rights to counsel have thus attached. (See, e.g., *Maine v. Moulton* (1985) 474 U.S. 159 [88 L.Ed.2d 481, 106 S.Ct. 477]; *United States v. Henry* (1980) 447 U.S. 264 [65 L.Ed.2d 115, 100 S.Ct. 2183]; *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199].)

[Citations.]" (*Mayfield, supra*, 14 Cal.4th 668, 758; see also *Arizona v. Mauro* (1987) 481 U.S. 520, 528 [95 L.Ed.2d 458, 107 S.Ct. 1931] [police did not engage in forbidden interrogation, for purposes of *Miranda*, by mere placement of officer in room to observe and tape-record conversation between suspect in custody, who had invoked right to silence, and suspect's wife].)[27] This conclusion is entirely consistent with *Perkins, supra*, 496 U.S. 292; one who voluntarily speaks alone to a friend, even during a break in a custodial interrogation, has no reason to assume, during the private conversation, that he or she is subject to the coercive influences of *police* questioning.

Second, the trial court found, on the particular facts, that Lisa was not, in any event, a police agent. Despite Lisa's recorded statement that the officers had asked her to speak with defendant, the court accepted the officers' testimony in court that it was Lisa's idea to speak with him, that they did not order or ask Lisa to act on their behalf, and that they did not provide guidelines for the meeting. Though defendant suggests otherwise, we must defer to these factual and credibility determinations, made after the court observed the officers' demeanor. (E.g., *People v. Dykes* (2009) 46 Cal.4th 731, 752 [95 Cal.Rptr.3d 78, 209 P.3d 1]; *People v. Rundle* (2008) 43 Cal.4th 76, 115 [74 Cal.Rptr.3d 454, 180 P.3d 224].) Also, as a legal matter, we independently agree with the trial court that, under these circumstances, Lisa was not a police agent.

■ Defendant urges that, even if Lisa initiated the meeting with him, the police somehow violated *Miranda* by "exploit[ing]" her possible status as an accomplice or accessory, and his vulnerability in the coercive atmosphere of custody, to obtain incriminating statements. But again, "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust" in a supposed friend or ally. (*Perkins, supra*, 496 U.S. 292, 297.) "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns. [Citations.]" (*Ibid.*)

■ Rather, *Miranda*'s aim is to ensure that the suspect's will to remain silent is not overborne by the coercive atmosphere of *police questioning* in custody. Both "custody" and "police questioning" are necessary to invoke *Miranda*, and both concepts are viewed from the suspect's perspective. (*Perkins, supra*, 496 U.S. 292, 296.) Even when the suspect is in the process of a custodial interrogation, voluntary statements to someone the suspect does not believe is a police officer or agent, in a conversation the suspect assumes is private, simply does not involve one of these two critical concerns.

---

[27] The above quoted statement in *Mayfield* stands on its own merits, though we added, as makeweight, the observation that, in that case, the meeting between father and suspect was entirely on their initiative, not that of the police. (*Mayfield, supra*, 14 Cal.4th 668, 758.)

Defendant's *Miranda* rights were not violated, and his statements in police custody were properly admitted.

### 2. *Alleged prosecutorial misconduct.*

 Defendant urges the prosecutor engaged in pervasive misconduct at the guilt phase of his trial, thereby violating both state law and his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial. Singly and in combination, he asserts, these instances of misconduct require reversal of the guilt verdict.[28]

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citation.] 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 29 [97 Cal.Rptr.3d 1, 211 P.3d 520] (*Friend*).)

Applying these standards, we find no basis for reversal. Many of defendant's claims were forfeited by failure to object, and each individually lacks merit, because there was either no misconduct or no prejudice. Even if we consider his strongest claims in combination, we are not persuaded that prejudicial misconduct occurred. We address defendant's assertions in turn.

---

[28] Here, as with most issues defendant raises on appeal, he urges that the claimed error or misconduct infringes various of his constitutional rights. Usually, even if he raised the issue in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. However, in each such instance, unless otherwise indicated, the appellate claim is either (1) one that required no trial court action by defendant to preserve it, or (2) invokes no facts or legal standards different from those the trial court was asked to apply, but merely asserts that the error or misconduct, insofar as wrong for the reasons actually presented to the court, had the additional *legal consequence* of a constitutional violation. To this extent, defendant's new constitutional arguments are not forfeited on appeal. Under such circumstances, of course, if we conclude the trial court did not err on the issue actually before it, the new constitutional "gloss" must be rejected as well, without any need for a separate constitutional discussion. We proceed accordingly. (See, e.g., *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581]; *People v. Partida* (2005) 37 Cal.4th 428, 433–439 [35 Cal.Rptr.3d 644, 122 P.3d 765].)

### a. *Comment on defendant's refusal of consent to search.*

In his opening argument, the prosecutor asserted that defendant was interrogated by the police, denied involvement, and offered an alibi. The prosecutor then stated, "After the denial by the defendant, a request was made for the defendant to consent to the search of the place he was staying at, meaning Lisa Henry's house. He denied such consent." Defense counsel promptly objected. The court responded, "The jury can disregard that." When defense counsel asked whether the court was going to "assign prosecutorial misconduct," the court stated, "No, I'm not going to assign prosecutorial misconduct. I'm going to ask the jury to disregard that."

Assuming, as defendant contends, that the prosecutor committed misconduct by commenting on defendant's exercise of his Fourth Amendment right to refuse consent to a search and by arguing evidence that would be inadmissible at trial, the court's response was sufficient to resolve the problem. The court immediately "asked"—i.e., politely admonished—the jury to disregard the argument, and later instructed the jury that "[s]tatements made by attorneys during the trial are not evidence."

Defendant insists a far more elaborate cautionary instruction was required, such as that suggested in *People v. Bolton* (1979) 23 Cal.3d 208 [152 Cal.Rptr. 141, 589 P.2d 396] *(Bolton)*. There the prosecutor twice insinuated in his closing remarks that, but for the rules of evidence, he could present information about the defendant's past crimes. This court found significant misconduct, though no prejudice in light of the overwhelming evidence that the defendant was guilty as charged. In a dictum footnote, *Bolton* contemplated what, short of outright reversal, is an effective remedy for improper prosecutorial argument. *Bolton* expressed the view that a "mere verbal rebuke" may be an insufficient deterrent, and stated that the trial court must give a cautionary instruction *on request* if it believes misconduct occurred. In that instance, *Bolton* proposed, the court should tell the jury that the prosecutor's remarks were "unwarranted," "improper," "uncalled for," unsupported by any evidence, and an attempt to prejudice the jury, and that, if they caused the jury to convict the defendant, the court would have to declare a mistrial. *(Bolton, supra,* at pp. 215–216, fn. 5.)

Here, defense counsel asked if the court was going to "assign misconduct," but counsel did not request a *Bolton*-type instruction.[29] Accordingly, and given the fleeting nature of the prosecutor's remark, the court's admonition to

---

[29] Though *Bolton* suggested that a mere admonition to disregard improper remarks may only serve to rub them in *(Bolton, supra,* 23 Cal.3d 208, 215–216, fn. 5), defense counsel may have decided just the opposite here. Though counsel sought to protect the record by asking for an "assign[ment] of misconduct," her failure to request a more elaborate admonition may have

the jury to disregard it was sufficient to cure any harm. We see no abuse of discretion in the trial court's handling of the matter.

### b. *Testimony of Mamie Jackson.*

Mamie Jackson, defendant's aunt, testified as a prosecution witness. Among other things, Jackson indicated that she and other members of defendant's family lived only a few houses away from Sarah LaChapelle's home, that defendant sometimes lived there also, and that he arrived there in the late afternoon or early evening of April 18, 1988, wearing a red leather suit. The prosecutor asked whether, when defendant entered the house, everyone left. Jackson responded simply that when he entered, he went to see his mother in her room. When the prosecutor asked how long defendant was in the house, Jackson said she was busy ironing a dress for her daughter and did not time his stay.[30]

The prosecutor then asked, "Did you tell the police back in April 19th of 1988 that when [defendant] entered the house that everyone ran out because [defendant] is very violent?" Defense counsel asserted, "Objection, Your Honor. That's speculation, it's prejudicial, and that's—" The court interrupted to disagree, stating that the witness "said she can't remember, so he's refreshing her memory." Counsel argued that the proper way to refresh Jackson's recollection was to have her read her statement to the police. The court responded, "He can ask her if that refreshes her recollection that that's what she told the police. [¶] Is that what you told the police—. . . Ms. Jackson?" Jackson answered, "I can't remember what I said now." In response to the prosecutor's further questions, Jackson confirmed that, earlier that morning, she had "looked over" a signed and initialed copy of her police statement.

The following colloquy then occurred: "[The Prosecutor]: As a matter of fact, [defendant] has kicked in the door in your house—[¶] [Defense Counsel]: Objection, Your Honor. Objection, Your Honor. [¶] [The Prosecutor]:—on three occasions?" The court interrupted to ask the basis of the defense objection, and counsel responded "Irrelevant." The court sustained the objection, admonished the jury to disregard the question, and cautioned the prosecutor to "keep it in the ballpark."

Defendant argues the prosecutor improperly attempted to use the device of refreshing Jackson's recollection to inject inadmissible and prejudicial "bad

---

stemmed from her conclusion that such an instruction would itself call the jury's undue attention to the prosecutor's comment.

[30] Later, during cross-examination, Jackson stated that she left the house before defendant did.

character" evidence of defendant's violent nature and uncharged violent acts into the guilt trial. He asserts the prosecutor's questions also violated the court's in limine decision to exclude evidence about defendant's violence against family members from both the guilt and penalty trials.

As the People assert, defendant forfeited the latter argument by failing to object *on that basis* at trial. (E.g., *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2]; *People v. Berryman* (1993) 6 Cal.4th 1048, 1072 [25 Cal.Rptr.2d 867, 864 P.2d 40].) In any event, though we are persuaded the prosecutor committed misconduct, we see nothing serious enough to constitute, or contribute to, grounds for reversal. Though its reaction was delayed, the court ultimately made an appropriate response to the prosecutor's tactic. Under the circumstances, we conclude, its actions were adequate to obviate any prejudicial effect.

At first, the court apparently thought the prosecutor was just trying to demonstrate that Jackson's vague trial testimony about defendant's presence at his grandmother's home in the hours before Sarah LaChapelle's nearby murder was inconsistent with her more contemporaneous police statement, and that she might be shading her testimony on the stand so as not to damage her nephew's case. In fact, the prosecutor's query whether the family had fled when defendant arrived did not ultimately produce a damaging answer from Jackson.

Once the prosecutor made clear his true purpose by asking Jackson whether defendant had thrice "kicked in the door" of his grandmother's residence—thus clearly attempting to inject extraneous evidence of defendant's propensity for violence—the court responded immediately. It prevented Jackson from answering, sustained the defense objection, instructed the jury to disregard the question, and admonished the prosecutor in front of the jury.

Moreover, the court later instructed the jury that "[i]f an objection was sustained to a question, do not guess what the answer might have been. Do not speculate as to the reason for the objection. Do not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it enables you to understand the answer."

We do not condone the prosecutor's improper tactics, but they produced no damaging evidence. Under the circumstances, we are confident the court's response was sufficient to cure any possible prejudice. In any event, in view of the very strong evidence of defendant's guilt, we are persuaded, by any standard, that this relatively brief incident did not contribute to the guilt verdict.

### c. *Asserted* Doyle *error; attorney-client privilege.*

During the direct examination of defendant, counsel asked him to explain why he had not told Sergeants Medsker and Paniagua what he was now telling the jury about what happened at Sarah LaChapelle's house. Defendant responded that he did not feel it would do him any good, because he "didn't too much like" Medsker. Moreover, he stated, about a week after his arrest, he learned from his initial appointed counsel, James Chaffee, that he faced the death penalty, and Chaffee advised him not to discuss the case with anybody.

On cross-examination, the prosecutor elicited from defendant that, on the Friday and Sunday preceding his trial testimony, defendant had "somewhat discussed" that testimony with his current counsel. Learning that current counsel was in the same firm as Chaffee, the prosecutor sarcastically repeated, "Oh, they were from the same office." A defense objection was sustained, and the prosecutor was directed to proceed by question and answer.

The prosecutor then asked whether, when Chaffee first advised him not to discuss the case with anyone, Chaffee had made notes of what defendant told him. When the defense objected that "we're getting into attorney-client confidential communication," the court responded, "He's just asking if he made notes. That's all. [Defendant] brought this up himself." In answer to the prosecutor's question, defendant then said, "I don't know. He probably did. I don't know." The prosecutor next asked if defendant had made notes of his conversation with Chaffee, and defendant said no. At that point, the prosecutor moved on to another topic.

Somewhat later, the prosecutor asked when defendant told Chaffee he saw two men coming out of Sarah LaChapelle's house. The court promptly sustained a defense objection, ruling that the prosecutor's question "go[es] beyond what he said Chaffee told him" and "assumes a fact not in evidence."

Later still, the prosecutor asked defendant whether "you [made] any effort to call the police and tell them that Mrs. LaChapelle was murdered" or "that you saw two men coming out of her home." Defendant said no. "As a matter of fact," the prosecutor continued, "you never told that to anyone until this jury heard it for the first time." Defense counsel objected on grounds of attorney-client privilege, and the court sustained the objection.

██ Defendant first argues the prosecutor's questions about defendant's failure to report the crime, or to tell the true story before trial, were misconduct under *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] (*Doyle*). *Doyle* forbids impeachment of a defendant's exculpatory trial

testimony with cross-examination about his or her postarrest silence after receiving *Miranda* warnings. (*Doyle, supra,* at p. 619.) Defendant did not object on *Doyle* grounds below, and thus has forfeited this claim.

In any event, it largely lacks merit. Insofar as the prosecutor questioned why defendant, upon discovering Sarah LaChapelle's body, did not promptly call the police, the prosecutor was not casting suspicion upon defendant's silence during a period after he had been arrested, and had heard and decided to exercise his *Miranda* rights. The prosecutor was simply making the point that if, as defendant now claimed, he innocently came upon the horrific murder of his family's neighbor, it would have been natural to summon assistance immediately. Such questions did not violate *Doyle,* and were not improper.

When the prosecutor went further, and asked whether defendant had told *anyone* the supposed true facts prior to trial, a defense objection on attorney-client privilege grounds was promptly sustained. If incipient *Doyle* misconduct lurked in this question, it was thus nipped in the bud.

Defendant also complains of the prosecutor's efforts to elicit the content of his pretrial conversations with his counsel. He asserts these efforts were invasions of his attorney-client privilege, as well as improper attempts to insinuate that he and his counsel colluded to produce "coached" and "rehearsed" testimony. The latter claim was forfeited by failure to raise it below. In any event, no basis for reversal appears. With one exception, each prosecutorial attempt to probe attorney-client conversations was squelched by a successful defense objection before any answer was forthcoming. The single exception, the prosecutor's question about whether defendant's first counsel, Chaffee, took notes of their initial conversation, produced an "I don't know" answer from defendant. The subject was not pursued. Defendant cannot have suffered prejudice.

Finally, defendant urges that the prosecutor exploited his theory of collusion between defendant and counsel, and improperly impugned defense counsel's integrity, by suggesting in his rebuttal that, when preparing for her just completed argument, counsel had "created" a "preposterous" defense involving a nonexistent "phantom killer," and said that counsel "wants you to start guessing about a phantom killer."

The claim is forfeited by failure to object below to the remarks now challenged. In any event, we find no misconduct.

 Personal attacks on opposing counsel, including accusations that counsel fabricated a defense or misstated facts in order to deceive the jury,

are forbidden. (E.g., *Friend, supra,* 47 Cal.4th 1, 30–31; *Zambrano, supra,* 41 Cal.4th 1082, 1154.) On the other hand, the prosecutor may vigorously argue his or her case, including the inferences to be drawn from the evidence. (*Friend, supra,* at p. 30.) A substantial portion of defense counsel's argument was devoted to the premise that defendant was not guilty of special circumstance murder if, though involved with another person in the burglary and robbery of Sarah LaChapelle's home, he was not Sarah's actual killer and did not intend to kill. In support of this theory, counsel interpreted the forensic evidence to suggest that, even if defendant was a coparticipant in the burglary and robbery, a second burglar and robber was the actual killer. It was in this context that the prosecutor responded by disparaging counsel's use of the evidence to manufacture a "phantom killer" theory.

The prosecutor did not accuse defense counsel of factual fabrication or deceit; he merely argued, as he was allowed to do, that there was no evidence for counsel's theory. The prosecutor's language was strong, but well within bounds we have previously recognized as permissible. (See *Zambrano, supra,* 41 Cal.4th 1082, 1154–1155, and cases cited.) No misconduct occurred.

### d. *Prosecutor's facial gestures.*

Defendant points to several instances in which the prosecutor smiled, smirked, or laughed in response to defendant's testimony. In prompt response to defense objections, the court twice strongly admonished the jury to disregard the prosecutor's reactions, expressions, and gestures, stating that they were irrelevant, and that the jury, exercising its common sense under the instructions, was the sole judge of defendant's veracity. The court's actions were sufficient to ameliorate any undue prejudice.

### e. *Alleged self-aggrandizement by the prosecutor.*

On Tuesday, December 15, 1992, just after both sides had rested at the guilt trial, the court began to discuss, in the jury's presence, the scheduling of closing arguments. The court indicated it would allow the jurors to choose between two alternative argument schedules. The prosecutor began to suggest that one of the court's proposed schedules—which would postpone arguments from Thursday, December 17, to Monday, December 21, thus giving the jury a five-day hiatus—might interfere with his long-planned holiday trip. At this point, defense counsel interjected an unspecified objection. Moments later, after desultory further discussion, the prosecutor stated, "I'll tell you what I'm going to do. I'm going to cancel my flight." The court asked the prosecutor whether he "[had] any reason to believe" that if the case was argued on Monday, it could not go to the jury on Tuesday. The prosecutor responded, "I think it's going to be close." In that event, the court decided, "we'll come back [for arguments] on Thursday afternoon."

Defendant contends the prosecutor's "I'm going to cancel my flight" remark was an improper attempt to garner personal sympathy and admiration from the jurors by appearing noble and dedicated. The claim is forfeited for failure to state this ground for objection below.

In any event, we cannot agree that this brief remark, made in the course of a scheduling discussion with the court, rose to the level of calculated self-aggrandizement. Nor, we are persuaded, would the jury reasonably have understood the comment in that way. This is especially so since the prosecutor soon seemed to retreat from his sacrificial offer, thereafter advising the court that Monday arguments would make his ability to travel a "close" issue. Indeed, as the jurors saw, the prosecutor never had to back up his offer, because the court accommodated him. Under these circumstances, we agree with the People that defendant's claim of improper self-aggrandizement is "tenuous and tangential." We find no misconduct.

#### f. *Referring to facts not in evidence.*

Defendant complains of an instance during the prosecutor's guilt phase summation when, in arguing that defendant's explanation for how he got blood on his clothing (i.e., his gun fell from his pants to the floor near the victim's body) was incredible, the prosecutor asked the jury to consider the size of a Smith & Wesson revolver and used his hands to demonstrate. Defense counsel objected that no evidence had been introduced on this subject. The court sustained the objection, admonishing that "[t]he jury can disregard it." Defendant insists the court's response was, typically, too weak, especially in its use of the equivocal word "can." However, in light of the general instruction that counsel's arguments are not evidence, the jury must have understood the argument was improper and should not be considered.

#### g. *Conclusion; cumulative prejudice.*

Defendant asserts that, even if no single instance warrants reversal on its own, the pervasive nature of the prosecutor's misconduct, the court's "quaint" but inadequate efforts to control the prosecutor, and the extended jury deliberations, indicating a close case, all point to a pattern of unfairness and prejudice that render the guilt verdict unsustainable. We disagree. As we have explained, defendant forfeited many of his misconduct claims; others are not well taken. Though several instances of misconduct, or arguable misconduct, occurred, the court for the most part took adequate remedial steps. Moreover, as noted, despite the jury's careful consideration of the capital charges, the evidence of defendant's guilt as the lone robber and killer of Sarah LaChapelle was strongly persuasive. Singly or in combination, and judged by any standard of prejudice, the cited instances thus cannot have influenced the guilt outcome. No basis for reversal appears.

### 3. *Instructional issues.*

#### a. *Burglary instruction based on CALJIC No. 14.59.*

Defendant argues the trial court erred by giving a version of CALJIC No. 14.59, concerning the elements of burglary. This standard instruction states, in essence, that the jury "should" find the defendant guilty if it unanimously agrees he or she entered the premises with the intent to steal or to commit a felony (in this case, robbery), and is not required to agree as to which particular crime the defendant intended to commit.[31] Though the clerk's transcript version of this instruction included the standard "should" language, defendant further notes the court substituted the word "must" when it read the instruction to the jury.

Defendant asserts that because he was not charged with the substantive crime of burglary, and because CALJIC No. 14.59, as given in his case, did not include the words "of burglary" after "guilty," the effect of this instruction was to direct a verdict of murder on the sole basis of a jury finding that he made an entry into Sarah LaChapelle's house with the intent to steal or rob. He claims he thereby suffered a violation of his state and federal constitutional rights to due process and a fair trial. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16.) The contention lacks merit.[32]

The court began by instructing the jury on the elements of murder, including first degree murder by premeditation and, on a felony-murder theory, by a killing in the commission *of* robbery or burglary. Addressing the law of felony murder, the court explained that if a human being was killed during the commission of burglary or robbery, the perpetrator is guilty of first degree murder if he or she had the specific intent to commit one of those underlying crimes. Similarly, the court instructed, if a *person was killed* by any one of several persons *engaged in* the commission of burglary or robbery,

---

[31] CALJIC No. 14.59 provides: "If you are satisfied beyond a reasonable doubt and agree unanimously that defendant made an entry with the specific intent to steal or to commit _____, a felony, you should find the defendant guilty. You are not required to agree as to which particular crime the defendant intended to commit when [he] [she] entered."

[32] The People urge the claim is forfeited because defendant requested the instruction, thus inviting any error. Indeed, though defendant argues his request was solely in connection with an unsuccessful attempt to obtain instructions on burglary as a lesser related offense of murder, his counsel later acquiesced in the giving of CALJIC No. 14.59 both before and after the court ruled it would not give lesser related offense instructions on burglary. Nonetheless, "[t]he invited error doctrine will not preclude appellate review [of an assertedly erroneous instruction] if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction. [Citations.]" (*Moon, supra*, 37 Cal.4th 1, 28.) The record here shows no tactical reason why defendant's counsel acquiesced in the instruction after its ostensible use for defense purposes was foreclosed. Hence, we decline to find forfeiture.

all those who actively assisted the perpetrator in committing the burglary or robbery, with knowledge of the perpetrator's felonious purpose, are also guilty of first degree murder.

The court next turned to the special circumstance allegations, noting that "[i]f you find the defendant guilty of murder in the first degree, you must then determine" whether one or both special circumstances is true. (Italics added.) The court set forth the elements of the robbery-murder and burglary-murder special circumstances, duly noting that the *murder* must have been committed *while the defendant was engaged* in one of those felonies. Finally, not yet having covered the elements, and the necessary specific intents, for burglary and robbery *as elements of felony murder and the charged special circumstances*, the court gave instructions, including CALJIC No. 14.59, on those issues.

In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled. (E.g., *People v. Ervine* (2009) 47 Cal.4th 745, 804 [102 Cal.Rptr.3d 786, 220 P.3d 820]; *People v. Smithey* (1999) 20 Cal.4th 936, 963–964 [86 Cal.Rptr.2d 243, 978 P.2d 1171] (*Smithey*); see *Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4 [116 L.Ed.2d 385, 112 S.Ct. 475].) Here, we find no reasonable likelihood the challenged instruction led the jury to believe it "should" or "must" find defendant guilty of Sarah LaChapelle's *murder* just because it concluded he entered her house with a felonious or larcenous purpose. Read as a whole, the instructions clearly informed the jurors a first degree felony-murder verdict was appropriate if the victim was killed during defendant's perpetration of, or knowing participation in, a robbery or burglary. (See *Holt*, *supra*, 15 Cal.4th 619, 680 [rejecting contention, in light of instructions as a whole, that failure to include the words "of burglary" after "guilty" in CALJIC No. 14.59 created a mandatory presumption the defendant was guilty of all charged crimes].) We find no error.

b. *First degree murder instructions.*

██ Defendant argues the court erred by instructing on first degree murder because the information simply charged him with murder in violation of section 187, and did not state the degree of the murder, cite the actual first degree murder statute (§ 189), or allege the facts necessary for first degree murder. Thus, he asserts, he was charged only with second degree murder.[33]

---

[33] The People urge the claim is forfeited, because defendant did not object below that he received inadequate charging notice. (See *People v. Bright* (1996) 12 Cal.4th 652, 671 [49 Cal.Rptr.2d 732, 909 P.2d 1354].) Defendant responds that his attack is not on the form or adequacy of the information, which validly charged second degree murder. Rather, he asserts, he challenges the unwarranted first degree murder instructions given at his trial, a claim we

"As defendant acknowledges, however, we have consistently rejected such arguments and have concluded that a defendant may be convicted of first degree murder even though the indictment or information charges only murder with malice in violation of section 187. (*People v. Whisenhunt* [(2008)] 44 Cal.4th [174,] 222 [79 Cal.Rptr.3d 125, 186 P.3d 496]; *People v. Hughes* [(2002)] 27 Cal.4th [287,] 368–370 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Witt* (1915) 170 Cal. 104, 107–108 [148 P. 928].) Defendant also contends that *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], prohibits [his] conviction on an uncharged crime. His reliance on *Apprendi*, however, is misplaced, because he was not convicted of an 'uncharged crime.' (*People v. Whisenhunt, supra,* 44 Cal.4th at p. 222.)" (*Friend, supra,* 47 Cal.4th 1, 54.)

### c. *Failure to require jury unanimity on theory of first degree murder.*

Defendant contends the trial court erred in failing to instruct the jury it was required to agree unanimously whether he committed premeditated murder or first degree felony murder. He claims a violation of his state and federal constitutional rights to proof beyond a reasonable doubt on all elements of a charged crime, a unanimous jury verdict, and a reliable guilt determination in a capital case. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16, 17.)[34]

As defendant acknowledges, however, we consistently have rejected the identical claim. (E.g., *Friend, supra,* 47 Cal.4th 1, 54; *People v. Benavides* (2005) 35 Cal.4th 69, 100–101 [24 Cal.Rptr.3d 507, 105 P.3d 1099]; *People v. Nakahara* (2003) 30 Cal.4th 705, 712–713 [134 Cal.Rptr.2d 223, 68 P.3d 1190] (*Nakahara*); *People v. Kipp* (2001) 26 Cal.4th 1100, 1132 [113 Cal.Rptr.2d 27, 33 P.3d 450] (*Kipp*); *People v. Carpenter* (1997) 15 Cal.4th 312, 394–395 [63 Cal.Rptr.2d 1, 935 P.2d 708].) Defendant presents no arguments that require us to reconsider these conclusions, and we decline to do so.

### d. *Instructions assertedly affecting reasonable doubt standard.*

Defendant urges that a series of standard instructions given by the trial court unconstitutionally diluted the prosecution's burden to prove guilt

---

may review even though he did not object to the instructions below. (§ 1259; see *Moon, supra,* 37 Cal.4th 1, 28.) Because the forfeiture issue is close and difficult, we decline to find that defendant forfeited his claim. (*Champion, supra,* 9 Cal.4th 879, 908, fn. 6.)

[34] The People claim forfeiture on grounds defendant did not request a unanimity instruction below. We find no forfeiture, because we understand defendant's argument to be that the court should have given such an instruction sua sponte.

beyond a reasonable doubt. As defendant acknowledges, we have rejected similar arguments as to all the instructions he cites: CALJIC Nos. 1.00, 2.01, 2.02, 2.21.2, 2.22, 2.27, 2.51, 2.90, 8.20, 8.83, and 8.83.1. (E.g., *Friend, supra,* 47 Cal.4th 1, 53; *People v. Whisenhunt, supra,* 44 Cal.4th 174, 221; *People v. Guerra* (2006) 37 Cal.4th 1067, 1138–1139 [40 Cal.Rptr.3d 118, 129 P.3d 321] (*Guerra*); *Nakahara, supra,* 30 Cal.4th 705, 713–715; *People v. Catlin* (2001) 26 Cal.4th 81, 148, 151 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Montiel* (1993) 5 Cal.4th 877, 941 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) He asks us to reconsider our conclusions, but we decline to do so.

### e. *CALJIC Nos. 2.03 and 2.06.*

Defendant contends the trial court erred when, over defense objections, it instructed the jury with CALJIC Nos. 2.03 (defendant's willfully false or misleading pretrial statement about the charged crimes as circumstance tending, but not alone sufficient, to show consciousness of guilt) and 2.06 (attempt by defendant to conceal evidence against himself or herself as circumstance tending, but not alone sufficient, to show consciousness of guilt). He claims violations of his rights to due process, a fair jury trial, and reliable determinations of guilt, special circumstances, and penalty under the Fifth, Sixth, Eighth, and Fourteenth Amendments. His arguments lack merit.

Defendant first asserts that these instructions are impermissibly one-sided and argumentative pinpoint instructions that allow juries to draw impermissible inferences of guilt. As he concedes, we have rejected the identical challenges many times (e.g., *People v. McWhorter* (2009) 47 Cal.4th 318, 377 [97 Cal.Rptr.3d 412, 212 P.3d 692] (*McWhorter*); *People v. Schmeck* (2005) 37 Cal.4th 240, 291 [33 Cal.Rptr.3d 397, 118 P.3d 451]; *Stitely, supra,* 35 Cal.4th 514, 555; *People v. Breaux* (1991) 1 Cal.4th 281, 303–304 [3 Cal.Rptr.2d 81, 821 P.2d 585]), and we do so again.

Defendant also urges the instructions were improper on the facts of this case. Of course, there was substantial evidence both of willfully false pretrial statements, and of concealing or destroying evidence. When the police told him they were investigating the stolen vehicle he was driving, and that the owner had been hurt, he lied, saying he obtained the car from Fred Bush. Moreover, there was evidence he threw away his bloody socks, and that Lisa Henry promptly washed the red leather suit he was wearing on the day of Sarah LaChapelle's murder.

Nonetheless, he urges, his lies and destruction of evidence had no rational tendency to prove he was guilty of the charged crime, first degree murder, because they had no bearing on the states of mind or specific intent necessary to establish that particular offense. Defendant overlooks that the

evidence tended to show his fear of apprehension for his involvement in Sarah LaChapelle's injury or death, and her killer's *identity* was a disputed issue. In any event, even where mental state is the principal issue, we have rejected the notion that consciousness of guilt instructions call for impermissible inferences about mental state, or are otherwise inappropriate. (E.g., *Zambrano, supra,* 41 Cal.4th 1082, 1160; *Moon, supra,* 37 Cal.4th 1, 28; *Smithey, supra,* 20 Cal.4th 936, 983.) The claim lacks merit.

### f. *CALJIC No. 2.51.*

Defendant contends the court should not have given CALJIC No. 2.51, which allows the jury to consider the presence or absence of motive as a circumstance that may tend to establish guilt or innocence. He urges that his state and federal constitutional rights to due process, a fair jury trial, and a reliable guilt and penalty determination (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15) were violated, because CALJIC No. 2.51 lessens the prosecution's burden of proof and irrationally allows the jury to find guilt on the basis of motive alone. We reject these arguments, as we have in the past. (E.g., *Friend, supra,* 47 Cal.4th 1, 53; *People v. Riggs* (2008) 44 Cal.4th 248, 314 [79 Cal.Rptr.3d 648, 187 P.3d 363]; *People v. Cleveland* (2004) 32 Cal.4th 704, 750 [11 Cal.Rptr.3d 236, 86 P.3d 302].)[35]

### C. *Penalty phase issues.*

#### 1. *Prosecutorial misconduct.*

Defendant asserts the prosecutor committed misconduct several times during his cross-examination of defendant's mother, Rosia Carter, who testified for the defense, and during his argument to the jury. To the extent misconduct occurred, the court dealt with it promptly and adequately. We conclude that, singly or in combination, the cited instances did not prejudice defendant.

##### a. *"Burglary gloves" suggestion.*

Rosia testified that, when told a male around 14 years old had died in the shed fire in her backyard on December 24, 1983, she first feared it was defendant, who was then 16 years old. The prosecutor reminded her that, assuming this was the correct date of the fire, defendant was then "in jail for committing a burglary, [was] he not?" Defense counsel did not object, and Rosia answered that she "thought it was a probation violation."

---

[35] The People urge the claim is forfeited inasmuch as defendant invited the error by requesting CALJIC No. 2.51. But the record shows no tactical reason for the request; hence, we find no forfeiture on this ground. (*Moon, supra,* 37 Cal.4th 1, 28; see § 1259.)

The prosecutor then asked, "Incidentally, in February of 1984 did you ever receive or go and pick up the gloves that [defendant] used in the burglary from my office?" Before Rosia could respond, defense counsel objected on grounds of irrelevance. The court sustained the objection, and the prosecutor moved on to other topics. We do not condone the prosecutor's effort to insinuate defendant's commission of an unproven burglary. However, given the brief nature of the episode, and the court's prompt response, we cannot conclude defendant was harmed.

b. *Suggestion that defendant "hit a store owner with a rock three times in the head."*

The prosecutor cross-examined Rosia at length about her efforts to discipline and support defendant through a childhood and youth marked by misbehavior and troubles with the law. In the course of this examination, and without objection by the defense, Rosia acknowledged, among other things, that she attended court when, in the prosecutor's words, defendant "burglarized a railroad car in 1981" with two other youths. The prosecutor then asked, "Did you—Did you attend court in July and August of 1983—[(interruption by the court)]—for [defendant] when he hit a store owner with a rock three times in the head?" Defense counsel objected on grounds that the incident to which the prosecutor was referring "[had] been resolved in favor of [defendant]" in that defendant "was acquitted of those charges."

After a brief discussion between court and counsel, the court instructed the prosecutor to "[c]hange [the question] to *accused* of hitting a store owner in the head three times with a rock," and the prosecutor agreed. (Italics added.) "The issue," the court stated to the witness, "is did you go to court?" Rosia responded, "I don't know." Counsel continued to object and requested an admonishment. Again the court explained it had "changed the question to 'accused,' not convicted or that he did it. And the question was did she go to court." On that basis, the court overruled the objection.

Defendant asserts there was little if any relevance to Rosia's attendance in court, and that the "gratuitous" reference to inadmissible violent conduct by defendant was inflammatory and prejudicial. However, as noted, the prosecutor, in asking about Rosia's court attendance, sought to rebut what defendant concedes was a defense theory that he was an unwanted child who suffered from maternal neglect and lack of support.

Moreover, the defense objection, as well as the court's response, to the prosecutor's original misframed question made clear to the jurors that defendant had been legally exonerated in the incident to which the question referred, and that they should disregard any implication he had committed an

assault with a rock. That understanding was reinforced when the jury was later instructed, as at the guilt phase, that they must not speculate why objections to questions were sustained, or what the answers might have been, and that statements or insinuations by counsel are not evidence. The court's treatment of the incident was sufficient, and we find no prejudice to defendant.

 c. *Questions about violence and theft against relatives and acquaintances.*

Defendant asserts the prosecutor committed prejudicial misconduct when he questioned Rosia about a series of violent acts by defendant as to which evidence had not previously been introduced. The following facts are pertinent:

At a pretrial *Phillips* hearing,[36] the trial court had specifically excluded, as aggravating evidence at the penalty phase (see § 190.3, factor (b) [other criminal conduct by defendant involving violence or threat of violence]), evidence of assaults by defendant on certain members of his own family—a cousin, Carla Spencer, and his aunts Brenda and Mamie Jackson. Further, the court had reserved judgment regarding evidence that defendant lacerated the face and neck of Patrick Shields during an assault.[37]

In its case-in-chief at the penalty phase, the prosecution did not present evidence of any of these incidents. As noted above, the prosecution confined its showing to three instances of defendant's criminal violence—a March 1986 traffic accident, after which defendant, driving a truck, pursued and fired shots at the other vehicle; violent resistance to a police officer during a traffic stop in September 1987; and an assault on Marlena Brown in February 1988. During her direct penalty phase testimony for the defense, Rosia asserted that after the death of her father in 1984, the family "fell apart." According to Rosia, several family members, including Brenda Jackson, Mamie Jackson, and Carla Spencer, had drug problems, family tensions sometimes exploded into physical fights, and defendant was involved in some of these fights. Rosia agreed with defense counsel's assessment "that the world [defendant] saw in 1984 when he was 16, 17 was a family with a lot of problems, a lot of drug use."

---

[36] In *People v. Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423], this court encouraged the use of preliminary inquiries, in advance of the penalty phase, to determine whether there is substantial evidence to support each element of "other criminal activity" the prosecution proposes to introduce as aggravating evidence. (*Id.* at pp. 72–73, fn. 25.)

[37] Shields's exact relationship to the family is unclear. At the *Phillips* hearing, the court assumed he was defendant's uncle, either biological or "by marriage." At the penalty phase, Rosia testified that Shields was the father of several of her nieces and nephews. (See below.)

While cross-examining Rosia, the prosecutor began asking about her knowledge of acts of violence by defendant against family members and others. The prosecutor first queried whether Rosia "witness[ed] the incident where [defendant] struck his cousin, Carla Spencer." Defense counsel objected, asserting that "if she didn't witness it, it's putting facts before the jury that didn't exist." The court sustained the objection on grounds that the question assumed facts not in evidence.

The following colloquy then occurred: "[The Prosecutor:] Do you know if [defendant] struck his cousin Carla Spencer in October of 1985? [¶] A. I know that there was some problems with them. I wasn't in the room. [¶] [The Prosecutor:] Do you know if your son struck his Aunt [Mamie] in October of 1985? [¶] A. No, I don't. [¶] [The Prosecutor:] Do you know if your son struck your sister Brenda in November of 1985? [¶] A. Well, that could be a yes or no answer. [¶] [The Prosecutor:] Do you know if your son struck Carla Spencer in January of 1986? [¶] A. I don't know. [¶] [The Prosecutor:] Do you know if your son stole your grandmother's and grandfather's truck in March of 1986 and wrecked it because he was mad at your grandmother?[38] [¶] A. He wasn't mad at my mother. [¶] [The Prosecutor:] Was he mad at anybody? [¶] A. No. My mother was out of town, so how could he be mad at her? [¶] He just saw the opportunity to get a car to drive or a truck to drive. [¶] [The Prosecutor:] Do you know Trina Berry? [¶] A. Yes, I do. [¶] [The Prosecutor:] Do you know if your son struck Trina Berry in September of 1987? [¶] A. No, I don't. [¶] [The Prosecutor:] Do you know Patrick Shields? [¶] A. Yes, I do. [¶] [The Prosecutor:] And who is Patrick Shields? [¶] A. He's the father of five of my nieces and nephews. [¶] [The Prosecutor:] Do you know if your son—[¶] [Defense Counsel:] Your Honor—[¶] [The Prosecutor:]—cut Patrick Shields' throat? [¶] [Defense Counsel:] I object to this, Your Honor. There is no evidence of that. It assumes a fact not in evidence, and there is no evidence that it's going to be presented. [¶] The Court: Sustained. [¶] [Defense Counsel:] It's extremely—[¶] The Court: Sustained. Sustained. Sustained. Sustained. Sustained. Sustained. Sustained. [¶] [Defense Counsel:] Could we have an admonishment? [¶] The Court: The jury may be admonished to disregard that."

When defense counsel asked the court for "a little more force," the court declined, noting that this was "not Hollywood." Clearly exasperated with the contentious atmosphere, the court asked rhetorically whether counsel wanted it to "stand on [its] feet and stomp and hold [its] breath." The court noted that it had proceeded "legally" by sustaining the defense objection and admonishing the jury, and indicated it was "not going to engage in histrionics up here."

---

[38] This appears to be a reference to the March 1986 traffic-accident-with-violence episode the prosecution introduced in its case-in-chief.

Defendant urges the prosecutor's questions were improper attempts to introduce inflammatory aggravating evidence (1) not presented in the People's case-in-chief, (2) beyond the scope of the direct examination of Rosia (see *People v. Ramirez* (1990) 50 Cal.3d 1158, 1191–1193 [270 Cal.Rptr. 286, 791 P.2d 965] [rebuttal evidence or cross-examination concerning defendant's "bad character" must respond specifically to particular "good character" evidence presented by defense witness]), and (3) in partial violation of the court's *Phillips* order. Assuming that defense counsel's "facts not in evidence" objections were sufficient to preserve these issues (see *Champion, supra*, 9 Cal.4th 879, 908, fn. 6), we find no prejudicial misconduct under the circumstances. Our reasons are several.

First, any direct complaint that the prosecutor violated the *Phillips* order lacks merit. In that order, the court merely excluded certain evidence from the prosecution's case-in-chief. But neither the *Phillips* order, nor the prosecution's failure to introduce particular evidence in its case-in-chief, precluded the proper introduction of rebuttal evidence. The issue thus becomes whether the evidence the prosecutor sought to elicit from Rosia was proper rebuttal.

Whether the questions about assaults against Carla Spencer, Brenda Jackson, and Mamie Jackson were proper rebuttal examination is a close question. Rosia had not testified to specific altercations between defendant and these particular persons. On the other hand, she had stated that family problems in 1984 concerned these family members, among others, and that the family tensions caused fights between defendant and other family members. The defense effort was to suggest defendant had been scarred by his involvement in a failing family unit that had lost its patriarch. Thus, to the extent the prosecutor sought to flesh out some of the violent family incidents, to show they continued well after 1984, and to demonstrate defendant was less a helpless witness and more a violent aggressor in these episodes, the questions appear proper.

No reason of proper rebuttal appears, however, for the prosecutor's insinuations concerning the assault on Trina Berry, a nonrelative, and the "throat-cutting" assault against Patrick Shields, whom Rosia had not mentioned as one of the family's "problem" members. We do not condone the prosecutor's improper efforts to introduce evidence of these incidents. It was misconduct.

Still, we conclude no prejudice arose. The trial court sustained both defense objections to this line of questioning. Its second response was particularly emphatic, as it repeated the word "sustained" seven times in a row. At defense counsel's request, the court further admonished the jury to disregard "that." The court's immediate reference was to the question whether Rosia was aware that defendant cut Patrick Shields's throat. But the jury

cannot have failed to understand, from the court's escalating response to two separate objections, that the prosecutor's entire series of questions about these violent incidents was disapproved, that no evidence about them had been introduced, and that the jurors were not to consider either the questions or the answers. Indeed, the court's refusal, in the face of a defense request for an even more forceful response, to engage in Hollywood "histrionics" by "stand[ing] on [its] feet, stomp[ing], and hold[ing] [its] breath," served, if anything, to bring home further the significance of the situation.

Moreover, Rosia gave "I don't know" answers to most of the prosecutor's questions, including his reference to Trina Berry. Rosia was never allowed to answer the provocative question regarding Patrick Shields. Her only possibly damaging testimony about defendant's assaults upon other relatives was her concession that defendant had "some problems" with Carla Spencer, and her "could be . . . yes or no" response to the question about an assault on Brenda Jackson. In light of the brutal capital robbery murder, and other evidence the jury heard about defendant's violence—including evidence that, when he was 18, he struck Rosia herself during an argument—there is no reasonable possibility (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135]) that any additional information Rosia provided about defendant's family violence affected the penalty outcome.[39]

> d. *Referring to facts not in evidence; expressing personal opinion.*

During his cross-examination of Rosia, the prosecutor asked if she blamed herself for how defendant had turned out. She said she did not feel responsible, but "I question myself as to what could I have [done] to change it or better it." The prosecutor said that question was fair and honest, "[b]ut I don't believe you're to blame." Before defense counsel could object, the court

---

[39] Defendant notes that the prosecutor, during his closing argument, asked the jury if it remembered the "series of questions" he asked Rosia about defendant's assaults on members of his family, including whether Rosia knew defendant had "beat[en]" Carla Spencer. The prosecutor then made the point that defendant "beat on all his family." Defense counsel objected that Rosia had given a "don't know" answer to the question about Carla Spencer and that the prosecutor merely sought to prejudice the jury. The court overruled the objection. We see no basis for reversal. We assume that insofar as the prosecutor referred the jury to a series of questions as to which objections had been sustained, he committed misconduct. For several reasons, however, we find no prejudice. First, we have concluded the questions about Carla Spencer, and about violence against other members of defendant's immediate family, were proper (see text discussion, *ante*). Second, Rosia did not profess complete lack of knowledge of the Carla Spencer incident; she said, ambiguously, that she knew defendant and Carla had "problems" but "wasn't in the room" during the incident to which the prosecutor alluded. Third, in light of the substantial properly admitted evidence of defendant's criminal violence, including an assault against his own mother, the brief argumentative reference to the Carla Spencer incident cannot have affected the penalty outcome.

interrupted to state, "Well, that's your opinion. [¶] The jury may be admonished to disregard that. [¶] Is that forceful enough, [defense counsel]?" Counsel responded, "Yes, Your Honor, given that we didn't object at the time." Notwithstanding counsel's concession below, defendant now claims that, by expressing his personal opinion, and thus acting as a witness, the prosecutor committed prejudicial misconduct violating, among other things, defendant's Sixth Amendment right to confrontation. However, as with many other misconduct claims raised by defendant in this appeal, we conclude the trial court responded adequately. Even if misconduct occurred, no prejudice arose.

We reach a similar conclusion with regard to the prosecutor's claim in argument that the murder victim, Sarah LaChapelle, was "a wholesome, sweet grandmother, whose life was committed to helping make poor and disadvantaged people's lives [better]." The trial court sustained defense counsel's objection, agreeing that "[t]here was no evidence of that. The jury can disregard that." The court's treatment of this fleeting reference was sufficient, and we can discern no prejudice.[40]

### e. *Conclusion; cumulative prejudice.*

Defendant claims the pervasive incidents of misconduct were collectively prejudicial. We disagree. We have identified several instances of clear or arguable prosecutorial misconduct—the gratuitous reference to defendant's "burglary" gloves, the questions and argument about assaults on nonrelatives, and the "I don't believe you're to blame" comment to Rosia. But the instances were relatively minor in context. The trial court usually made adequate responses to well-taken defense objections. The jury was generally instructed not to consider counsel's questions, insinuations, or arguments as evidence.

Moreover, the balance of properly admitted aggravating and mitigating evidence weighed very strongly against defendant. It portrayed him as a delinquent child and youth whose escalating violence culminated in the brutal murder and robbery of a female neighbor in her own home. While the evidence suggested that defendant, as a child, suffered some rough or neglectful treatment from the men in his mother's life, and that family tensions surfaced after the death of his grandfather, it also tended to show that he was raised by a mother who loved him and did her best, if imperfectly, to set him on the right path. There were no indications of serious mental or psychological issues. Under the circumstances, we are convinced

---

[40] Moreover, as the People point out, there was evidence to support the prosecutor's characterization of the victim as a sweet, wholesome, and compassionate grandmother.

there is no reasonable possibility that any instances of prosecutorial misconduct, whether considered singly or in combination, affected the penalty outcome.

### 2. Instructional issues.

#### a. Jury inquiry whether death or life without parole is the more severe punishment.

On February 2, 1993, the fourth day of penalty deliberations, the jury foreperson sent out a note stating, "We need to talk to you. We seem to be irrevocably deadlocked." Once counsel were present, the foreperson asked if the jury could get further instructions. The court indicated it could reread particular instructions if that would help, and asked whether the issue was "about deciding the penalty, about the circumstances and the weighing of the aggravating and mitigating [evidence]." The foreperson responded in the affirmative, then indicated that "the other thing to clarify for us, when you're weighing the severity of the punishment" was whether "death [was] the more severe punishment, or [was] life without chance of parole."

The court said "I can't tell you that," and stated the issue was not which penalty was more severe, but rather "which is the most appropriate punishment in this case based upon the evidence." The court then reread CALJIC No. 8.88, the standard instruction which explains, among other things, that, in order to reach a death verdict, "each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." Following this, the court began to reread CALJIC No. 8.85, which sets forth the relevant aggravating and mitigating factors. Halfway through this instruction, the jurors indicated that no further rereading was necessary.

The court then readmonished the jury that "we are not talking about which is the worst penalty," but, instead, which penalty is "justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." Again, the court stressed that the issue was "whether the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

Out of the jury's presence, defense counsel asserted that, during voir dire, several prospective jurors had indicated they thought life without parole was worse than death. In such cases, the court had responded by admonishing that jurors should not rely on this belief to impose the death penalty as an act of mercy. Counsel now requested that the sitting jurors be similarly admonished.

The court declined, noting, among other things, that it did not like to give "off-the-cuff" instructions, and that the "so substantial in comparison" instruction reread by the court "takes care of the problem."

On appeal, defendant asserts that in light of the jury request, the trial court had a duty, both under state law (see § 1138 [court must give jury requested information on point of law]) and pursuant to the Eighth Amendment guarantee of a capital jury suitably instructed to avoid an arbitrary and capricious death verdict, to clarify for the jury that death is the more severe punishment. However, we find no abuse of the court's sound discretion in handling the matter. (See, e.g., *People v. Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311] (*Beardslee*); *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1213 [275 Cal.Rptr. 729, 800 P.2d 1159] (*Gonzalez*).)

In *People v. Harris* (2005) 37 Cal.4th 310 [33 Cal.Rptr.3d 509, 118 P.3d 545], we upheld, as within the trial court's discretion, its decision to instruct, pursuant to a jury request, that death is the more severe penalty. This instruction was clearly a *correct* statement of the law, we explained, because the principle "[t]hat death is considered to be a more severe punishment than life [without parole] *is explicit in California law*: CALJIC No. 8.88 . . . states in pertinent part, 'To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.' " (*Harris, supra*, at p. 361, italics added.)

Implicit in this analysis is the assumption that CALJIC No. 8.88 itself, by stressing that death is warranted only where aggravation "so substantial[ly]" outweighs mitigation as to call for that penalty, makes the greater severity of the death penalty "explicit." It follows that the trial court adequately conveyed this principle by reinstructing the jury with CALJIC No. 8.88. Indeed, by indicating that no further rereading was necessary, the jury appeared to signal that the court's approach had clarified the issue. We find no basis for reversal.[41]

b. *Failure to give victim impact instruction.*

As noted above, the prosecution presented one victim impact witness, Sarah LaChapelle's son Anthony. He testified that the victim's death had hit both him and his children hard. As a result of the murder, he said, he became

[41] We are not persuaded otherwise by the trial court's admonition to the jury that the issue was not which penalty was worse, but instead concerned the weighing of aggravating and mitigating evidence under the instructions. In context, the court sought only to convey that the jurors should focus on the instructions, rather than considering their personal views about the severity of particular penalties, as the basis for rendering their penalty verdict.

an "instant mental case," developed a serious drinking problem, lost the ability to run the construction business he inherited from his father, and thereafter "never really got [him]self together." According to Anthony, he still dreamed about his mother and still needed help with decisions he should be able to make on his own. He was gently admonished by the court when, at the conclusion of his direct testimony, he stated, "And now I still want to get this guy. I want him to die. So I hope the law gets him for me."

The trial court gave all the standard penalty phase instructions, including those that set forth the relevant aggravating and mitigating factors (CALJIC No. 8.85), describe the process of weighing aggravating and mitigating evidence by which the penalty verdict should be reached (CALJIC No. 8.88), and admonish that the jury "must [not] be influenced by bias [or] prejudice against the defendant" (CALJIC No. 8.84.1). The court refused a defense instruction that while evidence had been introduced to show the "specific harm caused by the defendant's crimes," such evidence was not to "divert [the jury's] attention from [its] proper role of deciding whether defendant should live or die."

Relying on several out-of-state decisions, defendant contends that, under both state law and the Eighth Amendment, the trial court should have instructed on the proper use of victim impact testimony. A proper instruction, he suggests, would have told the jurors the following: They could consider victim impact evidence, which shows that the victim was a unique individual, as a circumstance of the capital crime. However, the law deems no one life more valuable than another. Thus, the jurors must confine themselves to a "rational inquiry into the culpability of the defendant, not an emotional response to the evidence." Further, they must not consider the opinions of the victim's survivors, or any other members of the community, as to the appropriate punishment.

██ However, we have repeatedly held that it is not error to refuse an instruction substantially identical to that defendant offered below, or to fail, sua sponte, to give an instruction substantially identical to the one defendant proposes on appeal. We have explained that the proffered instructions are misleading insofar as they suggest the jury may not be moved by sympathy for the victims and their survivors, and that the standard instructions adequately convey to the jurors the proper consideration and use of victim impact evidence. (E.g., *Carrington, supra,* 47 Cal.4th 145, 198; *People v. Bramit* (2009) 46 Cal.4th 1221, 1245 [96 Cal.Rptr.3d 574, 210 P.3d 1171]; *People v. Zamudio* (2008) 43 Cal.4th 327, 368–370 [75 Cal.Rptr.3d 289, 181 P.3d 105]; *People v. Valencia* (2008) 43 Cal.4th 268, 310 [74 Cal.Rptr.3d 605, 180 P.3d 351]; *Ochoa, supra,* 26 Cal.4th 398, 455; see *People v. Pollock* (2004) 32 Cal.4th 1153, 1195 [13 Cal.Rptr.3d 34, 89 P.3d 353].) We adhere to these conclusions here.

c. *Jury inquiry re meaning of duress.*

On the second day of penalty deliberations, the jury submitted a written request for clarification of sentencing factors (d) (whether the capital offense was committed "under the influence of extreme mental or emotional disturbance") and (g) ("[w]hether . . . the defendant acted under extreme duress or the substantial domination of another person"), as set forth in CALJIC No. 8.85. With the agreement of both counsel, the court first instructed the jurors that factors (d) and (g) are mitigating factors, orally recited both factors, and advised that the jury must resolve whether each of these factors was present or absent.

When the court asked whether this response satisfied the jury, the foreperson stated that the jurors wanted a "good legal definition" of duress. The foreperson acknowledged, in response to the court's query, that they wished to know "what the word means," then stated that "I think that the other—the part of 'duress' that we are concerned with is how direct or indirect can the duress be, at what distance might duress be impacted." The court asked for clarification of this latter concern, whereupon the foreperson said, "Well, both in a physical and in an abstract sense, how does—how does one put another under duress." Before withdrawing to consult with counsel, the court confirmed, in response to a question from another juror, that it was the jury's province to decide whether there was evidence to support any sentencing factor.

Court and counsel then conferred outside the jury's presence. Defense counsel argued that the jury's question suggested it was concerned about whether duress could be triggered by long-past events, such as childhood experiences. Defense counsel agreed with the court's intention to instruct the jury that it should use its commonsense understanding of duress, that a dictionary defined the word to mean "compulsion" or "coercion," and that whether duress was present was an issue for the jury to decide based on the evidence.

However, defense counsel requested an additional instruction "that the application of duress can extend to as far in time as [the jurors] deem appropriate." The court declined this instruction, stating that "whether or not the duress in this case has existed for a long period or a short period of time is a factual issue for [the jurors] to determine from the evidence in this case and the inferences therefrom."

Back before the jury, the following colloquy occurred: "The Court: Mrs. [S.] [(the foreperson)], we've given this—tried to give this response a lot of thought, and I'm not so sure this will be a satisfactory answer to you, but this

is the best thing we can come up with. First of all, with respect to the definition of 'duress,' I'm going to tell you to use your common sense understanding of what 'duress' means. To assist you, in Webster's New 20th Century Dictionary Unabridged, it can be defined as 'compulsion or coercion.' All right? The second thing, as I understand Mr. [M.'s] [(another juror)] question, is whether or not you can have direct or indirect duress and how long can it last. Is that what you're asking? Is that the question? [¶] The Foreperson: If duress can be directed from outside. [¶] The Court: Okay. Now, see, you're asking me to testify and give you information. I can't do that. [¶] The Foreperson: Oh. [¶] The Court: All I can tell you, is that—that you have to decide for yourself based upon the evidence that you've received in this case and any reasonable inferences that you, as the fact finders, come to. See, I can't tell you stuff that's not in the evidence. Okay? [¶] The Foreperson: I see. [¶] The Court: So I hope that helps you with the definition of duress. All right? Okay. We'll send you upstairs."

Out of the jury's presence, counsel renewed a request for the previously proposed additional instruction. The court reiterated its satisfaction with the answer it had given.

On appeal, defendant claims that three flaws in the court's response to the jury's inquiry violated his rights, under both state law and the federal Constitution, to a properly instructed capital penalty jury. First, he asserts the court was obliged to respond to the jury's specific question whether duress could be "indirect" and imposed from "outside." Second, he contends that by saying the jury was asking it to provide information "not in the evidence," the court implied there was no factual basis for a finding of duress. Third, he insists the court's instruction that the jury was to determine the issue of duress by drawing "reasonable inferences" from the evidence interfered with the jury's discretion to view the mitigating evidence subjectively in making the normative penalty decision.

Assuming these arguments were preserved by counsel's limited request below for an instruction on the temporal duration of duress (*Champion, supra,* 9 Cal.4th 879, 908, fn. 6), we find they lack merit. The court responded to the request for a definition of duress by giving the jury, with the approval of all counsel, a dictionary definition of the term as synonymous with coercion or compulsion. (See *Visciotti, supra,* 2 Cal.4th 1, 75 [for purposes of factor (g), the phrase "extreme duress" is not unduly vague; "duress" has a generally understood meaning of coercion or compulsion, and "extreme" "is generally understood as describing the farthest end or degree of a range of possibilities"].) Defendant cites no authority suggesting the court was obliged to "strike out on its own" (*Beardslee, supra,* 53 Cal.3d 68, 97) and expand upon this dictionary definition by explicitly addressing issues such as the temporal

duration of duress, or its "direct" or "indirect" nature. The court properly instructed that the presence or absence of extreme duress was a factual issue for the jury to decide.

Nor could the jury reasonably have understood the court's comments to mean there was no factual basis for a finding of duress. The court merely conveyed to the jurors that their specific questions about the meaning of duress called upon the court to exceed its proper role by invading the jury's province to find the facts for itself. The court repeatedly made clear that it was for the jury to decide, from the evidence, whether duress was present.

 Finally, the court did not err by telling the jury to resolve the issue of duress by drawing "reasonable" inferences from the evidence. The penalty decision itself is subjective and normative, but it cannot be "factually untethered." Instead, it must relate to evidence of the aggravating and mitigating factors set forth in section 190.3.

For this reason, both we and the high court have confirmed that instructions and argument admonishing the jury to decide penalty on the basis of the facts and the evidence are proper. (E.g., *California v. Brown* (1987) 479 U.S. 538, 542–543 [93 L.Ed.2d 934, 107 S.Ct. 837] (plur. opn. of Rehnquist, J.); see *id.* at pp. 544–545 (conc. opn. of O'Connor, J.); *People v. Avena* (1996) 13 Cal.4th 394, 437 [53 Cal.Rptr.2d 301, 916 P.2d 1000] [upholding prosecutorial argument that jury should decide penalty in accordance " 'with the facts and in accordance with the evidence presented to you in this case' " (italics omitted)]; *People v. Wright* (1990) 52 Cal.3d 367, 443 [276 Cal.Rptr. 731, 802 P.2d 221] [upholding prosecutor's plea that jury should not decide penalty on " 'an emotional basis,' " but on " 'a cool, clear, logical basis' " and on " 'the facts and the law' "]; *Gonzalez, supra,* 51 Cal.3d 1179, 1225 [instruction that admonished against penalty decision based on mere "sympathy" upheld because it warned only against factually untethered sympathy]; see *Zambrano, supra,* 41 Cal.4th 1082, 1176 [prosecutor's antisympathy argument merely pursued the theme that the particular defendant did not deserve mercy "on the basis of the evidence actually presented"].)

It follows that, in finding the facts that underlie the jury's normative penalty decision, the jury should rely on the evidence presented and *reasonable* inferences to be drawn therefrom. A court instruction to this effect is not error. The court responded properly to the jury's request. No basis for reversal appears.

### 3. *Challenges to California death penalty law and instructions.*

Defendant raises numerous constitutional challenges to California's death penalty law, and to the adequacy of the standard instructions directing the

jury's penalty determination. We affirm the decisions that have rejected similar claims, and decline to reconsider such authorities, as follows: Section 190.3, factor (a), is neither vague nor overbroad, and does not impermissibly allow arbitrary and capricious imposition of the death penalty. (*Friend, supra,* 47 Cal.4th 1, 90; *Guerra, supra,* 37 Cal.4th 1067, 1165.) The standard penalty instructions are not deficient because they fail to identify which sentencing factors are aggravating and which are mitigating (*Friend, supra,* at p. 90; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1064 [90 Cal.Rptr.2d 607, 988 P.2d 531]), or because they fail to require written findings (*Friend, supra,* at p. 90; *People v. Prieto* (2003) 30 Cal.4th 226, 275 [133 Cal.Rptr.2d 18, 66 P.3d 1123]) or jury unanimity (*Friend, supra,* at p. 89; *People v. Abilez* (2007) 41 Cal.4th 472, 533 [61 Cal.Rptr.3d 526, 161 P.3d 58]) regarding the aggravating factors.

The instructions are not constitutionally faulty insofar as they fail to require proof beyond reasonable doubt of each aggravating factor, or findings that aggravation outweighs mitigation and that death is the appropriate penalty. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1067 [71 Cal.Rptr.3d 675, 175 P.3d 632]; *People v. Bell* (2007) 40 Cal.4th 582, 620 [54 Cal.Rptr.3d 453, 151 P.3d 292].) Recent United States Supreme Court decisions interpreting the Sixth Amendment's jury trial guarantee (e.g., *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey, supra,* 530 U.S. 466) have not altered our conclusions in this regard. (*Brasure, supra,* at p. 1067; *Bell, supra,* at pp. 620–621.)

As noted, CALJIC No. 8.88 specifies that the jury may return a sentence of death only if each juror is persuaded the aggravating circumstances are "so substantial" in comparison to the mitigating circumstances that death is warranted. Jurors so instructed need not further expressly be told that life without parole is mandatory if aggravation does not outweigh mitigation or if mitigation outweighs aggravation, or that life without parole is permissible even if aggravation outweighs mitigation. (*Friend, supra,* 47 Cal.4th 1, 90; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 124 [17 Cal.Rptr.3d 710, 96 P.3d 30] (*Coffman and Marlow*).) Nor need the jury be instructed that the law presumes life without parole, rather than death, to be the appropriate penalty. (*McWhorter, supra,* 47 Cal.4th 318, 379; *People v. Gutierrez* (2009) 45 Cal.4th 789, 833 [89 Cal.Rptr.3d 225, 200 P.3d 847]; *Kipp, supra,* 26 Cal.4th 1100, 1137; *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

The phrases "so substantial" and "warranted" in CALJIC No. 8.88 are not unconstitutionally vague. (*Friend, supra,* 47 Cal.4th 1, 90; *People v. Salcido* (2008) 44 Cal.4th 93, 117 [79 Cal.Rptr.3d 54, 186 P.3d 437]; *Coffman and*

*Marlow, supra,* 34 Cal.4th 1, 123.) CALJIC No. 8.88 is not defective for failing to inform the jury as to which side bore the burden of persuading it that death was appropriate or inappropriate. (*Friend, supra,* at p. 90; *Coffman and Marlow, supra,* at p. 124.)

The jury may properly consider evidence of unadjudicated violent criminal activity under section 190.3, factor (b). (*Friend, supra,* 47 Cal.4th 1, 90; *People v. Panah* (2005) 35 Cal.4th 395, 499 [25 Cal.Rptr.3d 672, 107 P.3d 790].) The 1978 death penalty law is not unconstitutional insofar as it fails to provide for intercase proportionality review. (*Friend, supra,* at p. 89; *People v. Cook* (2007) 40 Cal.4th 1334, 1368 [58 Cal.Rptr.3d 340, 157 P.3d 950]; *Moon, supra,* 37 Cal.4th 1, 48; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871].) Nor does the death penalty statute deny equal protection to capital defendants. (*Friend, supra,* at p. 90; *People v. Hinton* (2006) 37 Cal.4th 839, 913 [38 Cal.Rptr.3d 149, 126 P.3d 981].)

International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. (*Friend, supra,* 47 Cal.4th 1, 90; *Guerra, supra,* 37 Cal.4th 1067, 1164.)

### E. *Cumulative error and prejudice.*

Defendant contends the cumulative effect of the asserted guilt and penalty phase errors warrants reversal of his conviction and death sentence even if none of the errors is prejudicial individually. For the reasons set forth above, we conclude that any errors or assumed errors were nonprejudicial, whether viewed separately or cumulatively.

## III. DISPOSITION

The guilt and penalty judgments are affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**MORENO, J.,** Concurring.—Although I concur in the majority opinion, I write separately to address the trial court's refusal to give Prospective Juror A.S.-P. an opportunity to refute the prosecutor's assertion that she had lied about her academic credentials. It is true that a defendant "has a right to jurors who are qualified and competent, not to any particular juror." (*People v. Holt* (1997) 15 Cal.4th 619, 656 [63 Cal.Rptr.2d 782, 937 P.2d 213].) However, where hearsay allegations are made regarding the truthfulness of a prospective juror, fairness requires that the prospective juror be given an opportunity to respond to those charges—fairness not only to the party

objecting to the prospective juror's excusal on this ground but to the juror herself whose reputation has been sullied by an allegation of dishonesty.

We give seated jurors this opportunity when such charges are made against them. "When the trial court discovers during trial that a juror misrepresented or concealed material information on voir dire tending to show bias, the trial court may discharge the juror if, *after examination of the juror*, the record discloses reasonable grounds for inferring bias as a 'demonstrable reality,' even though the juror continues to deny bias. [Citations.]" (*People v. Price* (1991) 1 Cal.4th 324, 400 [3 Cal.Rptr.2d 106, 821 P.2d 610], italics added.) Here, the prosecutor's allegations against Prospective Juror A.S.-P. went to her credibility, with the implication that, if she had lied about her academic credentials, she may have lied about other matters, and perhaps did so to conceal some bias. In my view, the court should have dealt with this situation in precisely the same manner as if this charge had been made after A.S.-P. had been seated as a juror. She should have been called and examined and given an opportunity to clear her name. It is deeply regrettable that the trial court failed to do so.

Werdegar, J., concurred.

Appellant's petition for a rehearing was denied September 1, 2010.